**PRATT & WHITNEY CANADA, INC., Appellant,**

v.

**Joseph W. SHEEHAN, Appellee.**

**Joseph W. SHEEHAN, Cross–Appellant,**

v.

**UNITED TECHNOLOGIES, Pratt & Whitney, formerly known as United Aircraft of Canada, Ltd.; United Technologies, Pratt & Whitney Canada; Pratt & Whitney Aircraft of Canada, Ltd., a subsidiary of United Technologies; Pratt & Whitney Canada, Inc., a subsidiary of United Technologies; United Aircraft Corporation; Pratt & Whitney Aircraft; and Paul Kerstetter, Cross–Appellees.**

Nos. S–4569, S–4597.

Supreme Court of Alaska.

May 28, 1993.

Jonathan M. Hoffman, Martin, Bischoff, Templeton, Langslet & Hoffman, Anchorage, for appellant, cross-appellee Pratt & Whitney Canada, Inc.

James A. Parrish, and Joseph W. Sheehan, Fairbanks, for appellee, cross-appellant Joseph W. Sheehan.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This case arose from the engine failure and subsequent forced landing of an aircraft at Fairbanks International Airport. The aircraft, a Dehavilland Turbo Beaver, was owned and piloted by Joseph W. Sheehan. The aircraft's engine, manufactured and later overhauled by defendant Pratt & Whitney Canada, Inc. (PWC), experienced a catastrophic failure shortly after takeoff. This failure and the resulting forced landing caused substantial damage to the aircraft, including its frame and engine.

Following unsuccessful attempts to obtain compensation for the damage to his plane, Sheehan, an attorney, brought suit on his own behalf against PWC. In the

superior court,[1] the parties stipulated to dismissal of all claims with prejudice except for the strict products liability claim in Count I of Sheehan's First Amended Complaint. PWC stipulated that it would not contest liability on Count I, but reserved the right to appeal the superior court's judgment. Specific issues were reserved for trial, including prejudgment interest; which party prevailed for purposes of Civil Rules 79 and 82; and costs or attorney's fees. The superior court approved the stipulation and the remaining issues were either tried to the court or presented in post-trial briefs and oral arguments.

The superior court found that Sheehan was the prevailing party and awarded him Civil Rule 82 fees as a *pro se* attorney litigant. The superior court denied Sheehan's request for full expert witness fees. With respect to Sheehan's request for prejudgment interest, the superior court awarded him interest on the cost of repairing the aircraft, calculated from the date he notified PWC of the crash; denied interest on the entire value of the aircraft; and denied additional interest on the money he advanced for the necessary repairs. The superior court entered judgment for Sheehan in the amount of $393,466.58. This appeal and cross-appeal followed.

## I. STRICT PRODUCTS LIABILITY AND ECONOMIC LOSS

■■■ PWC argues that Sheehan's economic loss for the damage to his aircraft should not be compensable in a tort action for strict products liability.[2] In *Northern Power & Engineering Corp. v. Caterpil-*

lar *Tractor Co.*, 623 P.2d 324 (Alaska 1981), we held that a litigant may recover economic loss in strict products liability if the "defective product creates a situation potentially dangerous to persons or other property, and loss occurs as a result of that danger...." *Id.* at 329 (footnote omitted). Mid-flight engine failure caused by a defective product is a paradigmatic example of a "potentially dangerous" situation for which economic loss is recoverable. Thus, PWC urges that we overrule our decision in *Northern Power* in favor of a per se ban on recovery for damage solely to the product itself.[3]

When a common law court is asked to overrule one of its prior decisions, the principle of stare decisis is implicated. The obligation to follow precedent inherent in stare decisis:

[B]egins with necessity, and a contrary necessity marks its outer boundary.... [N]o judicial system could do society's work if it eyed each issue afresh in every case that raised it.... At the other extreme, a different necessity would make itself felt if a prior judicial ruling should come to be seen so clearly as error that its enforcement was for that very reason doomed.

*Planned Parenthood v. Casey*, —— U.S. ——, ——, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992) (citations omitted). Thus, stare decisis is a practical, flexible command that balances our community's competing interests in the stability of legal norms and the need to adapt those norms to society's changing demands.[4] In balanc-

1. PWC petitioned for removal to the United States District Court, but the district court vacated the petition and returned the case to the superior court.

2. This issue presents a question of law subject to *de novo* review. Under this standard, we adopt the rule of law that is most persuasive in light of precedent, reason and policy. *Langdon v. Champion*, 745 P.2d 1371, 1372 n. 2 (Alaska 1987).

3. PWC also argues that Sheehan's strict products liability claim is governed by the law of Canada, where the engine overhaul was carried out, and that "a Canadian court would be more likely to adopt [a ban on recovery of economic loss] than

the rule of *Northern Power*." PWC, however, has waived this argument because it failed to brief the issue on its appeal.

If we overrule *Northern Power*, Sheehan would prevail only if he could prove that some "other property" was injured. Both the airframe and engine of Sheehan's plane were damaged by the engine defect. Thus, Sheehan would need to show that the airframe and engine were separate pieces and not part of a single product. We need not address that issue, however, as we ultimately reaffirm *Northern Power*.

4. The second Justice Harlan described this balancing as including:

ing these interests, we will overrule a prior decision only when " 'clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent'...." *State v. Dunlop,* 721 P.2d 604, 610 (Alaska 1986) (quoting *State v. Souter,* 606 P.2d 399, 400 (Alaska 1980)). A decision may prove to be originally erroneous if the rule announced proves to be unworkable in practice. *Casey,* — U.S. at —, 112 S.Ct. at 2808. Additionally, a prior decision may be abandoned because of "changed conditions" if "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, [or] facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application...." *Id.* at —, 112 S.Ct. at 2809.

In the present case, we have not been persuaded to depart from stare decisis and abandon our decision in *Northern Power.* In explaining this conclusion, first, we briefly summarize the legal background of strict products liability in Alaska and discuss a United States Supreme Court case addressing strict products liability and economic loss under maritime law. Second, we discuss whether reason exists, in the prevailing law or otherwise, to overrule *Northern Power.*

### A. Legal Background

1. *Alaska Law*

Alaska strict products liability precedent begins with *Clary v. Fifth Avenue Chrysler Center,* 454 P.2d 244 (Alaska 1969), where we adopted the rule in *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962). *Greenman* provided that:

> [A] manufacturer is strictly liable in tort when an article he places on the market

knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.

*Id.,* 27 Cal.Rptr. at 700, 377 P.2d at 900.

In adopting *Greenman,* we rejected the argument that contract-warranty law should govern claims for personal injury caused by a defective product and concluded that strict liability in tort affords the most logical, least technical, and most comprehensive solution. We were persuaded that strict products liability would:

> [I]nsure that the cost of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best.

*Clary,* 454 P.2d at 248.

Seven years later, in *Morrow v. New Moon Homes, Inc.,* 548 P.2d 279 (Alaska 1976), we first addressed recovery of economic loss under strict products liability. Morrow had purchased a mobile home that turned out to be a "lemon"; it had a defective furnace, cracked windows, a leaky bathroom, and a leaky roof. We characterized Morrow's loss—the diminished value of the product itself—as "economic" and proceeded to the question "whether strict liability in tort should extend to economic loss...." *Id.* at 283. In answering this question, we examined the prevailing views in *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (economic loss recoverable in contract, not strict products liability), and *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965) (economic loss recoverable in strict products liability), and concluded that the *Seely* approach was preferable. We held that the "theory of strict liability in tort which we recognized in *Clary* does not extend to the consumer who suffers only

---

[T]he desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case, and the

necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments. The reasons for rejecting any established rule must always be weighed against these factors.

*Moragne v. States Marine Lines,* 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339 (1970).

economic loss because of defective goods."[5] *New Moon,* 548 P.2d at 286. In doing so, we read *Clary* narrowly to "[apply] only when the defective product causes *personal injury.*" *Id.* at 283 (emphasis added).

One year after *New Moon,* we revisited the question of economic loss in *Cloud v. Kit Manufacturing Co.,* 563 P.2d 248 (Alaska 1977). There, a fire caused by a highly flammable rug padding destroyed Cloud's mobile home and its contents. We held that Cloud could maintain a strict liability action in tort. Essentially for the policy reasons identified in *Clary,* we extended strict liability beyond the narrow "personal injury" reading in *New Moon,* and stated that "direct physical injury to property and personal injury should be treated similarly in the resolution of products liability litigation." *Id.* at 250. We distinguished the damage suffered in *New Moon* on the basis that:

> [T]he Morrows were plagued by a "lemon," not an unsafe product. The Morrows' trailer was not suited for the purpose for which it was purchased, but the defects in it were not such that they resulted in sudden, violent or calamitous harm. Having been deprived of the intended use of their product, the harm in that case was properly classified as economic loss.

*Id.* at 251. We also laid the foundation for our decision in *Northern Power,* explaining that "[w]e cannot lay down an all inclusive rule to distinguish between [economic loss and property damage]; however, we note that sudden and calamitous damage will almost always result in direct property damage and that deterioration, internal breakage and depreciation will be considered economic loss." *Id.*

*Northern Power & Engineering Corp. v. Caterpillar Tractor, Co.,* 623 P.2d 324 (Alaska 1981), involved the engine failure of a diesel-powered electrical generator. The engine failure severely damaged the generator itself but did not damage persons or other property. We affirmed the superior court's finding that the loss was "entirely economic," since there was "no evidence in the record that such a defect presented a danger to persons or other property and no evidence of violence, fire, collision with external objects, or [other] calamity as a result of this failure." *Id.* at 329, 330. Then, for the first time, we squarely addressed whether a litigant may recover for injury *solely* to the product itself in strict products liability. We held that such damages are recoverable:

> [W]hen a defective product creates a situation potentially dangerous to persons or other property, and loss occurs as a result of that danger, strict liability in tort is an appropriate theory of recovery, even though the damage is confined to the product itself. In order to recover on such a theory plaintiff must show (1) that the loss was a proximate result of the dangerous defect and (2) that the loss occurred under the kind of circumstances that made the product a basis for strict liability.[6]

*Id.* at 329 (footnotes omitted).

These cases show that the development of strict products liability in Alaska is founded on the principle that "[c]ontract law has been traditionally concerned with the fulfillment of reasonable economic expectations ... [while by contrast, the tort

---

5. In rejecting tort liability in *New Moon,* we relied in large part on the existence of the warranty provisions in article 2 of the Uniform Commercial Code. *See* AS 45.02.314 & .315. Since the legislature had spoken regarding a purchaser's remedy for an unsatisfactory product:

> [A]doption of the doctrine of strict liability for economic loss would be contrary to the legislature's intent when it authorized the ... remedy limitations and risk allocation provision of Article II of the Code. To extend strict tort liability to reach the Morrows' case would

in effect be an assumption of legislative prerogative on our part and would vitiate clearly articulated statutory rights. This we decline to do.

*New Moon,* 548 P.2d at 286 (footnotes omitted).

6. In the footnote to this text we explained that:

> The requirement that the loss occur under dangerous circumstances is necessary because, in our view, allowing recovery solely on proof that a defect *could* endanger persons or property is too speculative.

*Northern Power,* 623 P.2d at 329 n. 11.

doctrine of strict products liability] is concerned with the *safety* of products and the corresponding quantum of care required of a manufacturer." *Id.* at 328 (emphasis added). By focusing on consumer *safety*—through a test that hinges on the *danger* presented by a defective product—our rule remains faithful to this distinction between contract law and tort law.[7]

### 2. *Maritime Law*

The evolution of strict products liability in maritime law is contained within a single case: *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). *East River* involved several supertankers that contained defective turbines. The plaintiff corporations had chartered the supertankers shortly after their construction. Soon after chartering the supertankers, several of the turbines, which propelled the vessels, malfunctioned. The charterers brought strict products liability claims against the corporation that designed and manufactured the turbines. Since each malfunction "damaged only the turbine itself," the charterers suffered only economic damage. The United States Supreme Court addressed two issues: (1) should the doctrine of strict products liability be adopted for admiralty law; and, if so (2) should that doctrine encompass recovery for economic loss.

The Supreme Court answered the first question in the affirmative. *Id.* at 864–66, 106 S.Ct. at 2298–300. As to the second question, the Supreme Court reviewed the three main approaches courts have taken to economic loss under strict products liability. As noted above, these approaches include: (1) the pure contract approach of *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), under which no economic loss is recoverable in strict products liability; (2) the pure tort approach of *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), under which economic loss is recoverable in strict products liability; and (3) the "intermediate" approach of *Northern Power,* under which economic loss is recoverable when the defective product creates a situation potentially dangerous to persons or other property, and loss occurs due to that danger.

The Supreme Court summarily rejected the *Santor* approach as "fail[ing] to account for the need to keep products liability and contract law separate spheres and to maintain a realistic limitation on damages." *East River,* 476 U.S. at 870–71, 106 S.Ct. at 2302. The Court also rejected our intermediate position, adopting instead an approach similar to *Seely:* "a claim of a non-working product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract." *Id.* at 872, 106 S.Ct. at 2303.

The Court reached this result in part because "[t]he tort concern with *safety* is reduced when an injury is only to the product itself." *Id.* at 871, 106 S.Ct. at 2302 (emphasis added). Indeed, the Supreme Court repeatedly referred to the need to promote safety, *id.* at 867, 869, 871, 106 S.Ct. at 2300, 2301, 2302, a rationale invoked by this court in *Northern Power.* Our intermediate approach, however, applies only to economic losses incurred under circumstances that implicate the safety rationale. Recognizing this fact, the Supreme Court further criticized our approach as "too indeterminate to enable manufacturers easily to structure their business behavior." *Id.* at 870, 106 S.Ct. at 2301.

### B. Whether to Retain *Northern Power?*

PWC argues that we should overrule *Northern Power* in favor of the Supreme

---

7. The public policy that spawned tort recovery in the product liability context was a desire to provide protection of the public from *unsafe* products beyond that provided by contract law. Tort product liability theories impose responsibility on the supplier of a defective product whenever it causes personal injury or damage to other property because this is deemed to be the best way to allocate the risk of *unsafe* products and to *encourage safer* manufacture and design.
*REM Coal Co. v. Clark Equip. Co.,* 386 Pa.Super. 401, 563 A.2d 128, 129 (1989) (emphasis added).

Court's rule in *East River*.[8] Since we are not bound to follow the United States Supreme Court on an issue of state common law, PWC urges three reasons to follow the Supreme Court's approach. First, PWC argues that we should reconsider *Northern Power* "in light of the U.S. Supreme Court's specific criticisms of *Northern Power* in *East River Steamship*." Second, PWC argues that Alaska law is not "wholly consistent" in this area. In PWC's view, our intermediate approach is "a murky trudge through sophisticated nuances...." *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 119 (3rd Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987). Third, PWC argues that we should follow the trend in other jurisdictions of adopting *East River*. These arguments essentially invite us to determine that *Northern Power* was originally erroneous. We address each argument in turn.

First, PWC urges that we reconsider and reverse *Northern Power* in light of the United States Supreme Court's criticism of our decision. As noted above, the Supreme Court rejected our intermediate approach for two reasons. First, the Supreme Court stated that economic loss does not implicate the safety rationale of torts. *East River*, 476 U.S. at 871, 106 S.Ct. at 2302. While we agree with the Supreme Court that economic loss, in the abstract, can be viewed as "essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law," *id.* at 870, 106 S.Ct. at 2302, we also believe that dangerous circumstances that, in actuality, occasion some economic losses also implicate safety—the "core concern" of tort law. Similarly, the Washington Supreme Court found unsupported the Supreme Court's argument regarding safety and economic loss. As the Washington court recognized, "the Court says nothing to explain why safety concerns are not implicated." *Washington Water Power v. Graybar Elec.*, 112 Wash.2d 847, 774 P.2d 1199, 1210 (1989). Indeed, *"[A] defective product is still dangerous even though it did not reach its full potential for harm by causing personal injury or damage to other property."* *Oklahoma Gas & Elec. Co. v. McGraw–Edison Co.*, 834 P.2d 980, 985 (Okla.1992) (Opala, C.J., dissenting). Thus, we believe that *East River* "unjustifiably dismisses the safety concerns attendant to product injuries caused by hazardous defects."[9] *Graybar*, 774 P.2d at 1209.

8. The parties also argue a fourth position: no recovery of economic loss under strict liability when the parties transacted in a commercial context. To some extent, the New Jersey courts have taken this approach. *See Spring Motors Distributors v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660, 673 (1985) ("[a]s among commercial parties in a direct chain of distribution, contract law, expressed here through the U.C.C., provides the more appropriate system for adjudicating disputes arising from frustrated economic expectations."). Distinguishing between consumers and commercial buyers is, in our view, problematic. *See Continental Ins. v. Page Eng'g Co.*, 783 P.2d 641, 668 n. 17 (Wyo.1989) (Urbigkit, J., dissenting) ("The arbitrary differentiation of users into either a commercial or consumer buyer as the test of providing litigative protection is, in itself, an interesting due process and equal protection inquiry...."). Judge Jones of the Alabama Supreme Court eschewed such a distinction as false:

   It is fallacious reasoning to presume that commercial law will furnish an adequate remedy for damage to the product. The rationale of *East River* is to the effect that sophisticated buyers and sellers of commercial products, as opposed to consumer goods, are free to bargain at arm's length with respect to the warranty of the product. This is simply not true. The manufacturer of standardized products either elects to warrant the product or not to warrant the product; and, if it warrants the product, it can limit both the quality and quantity of that warranty as it sees fit. I have never heard of the purchaser of a piece of machinery having any input into either the nature or the extent of any warranty given by the manufacturer. Such warranties are standardized by the manufacturer and are not subject to bargained-for variances by the purchaser.

   *Lloyd Wood Coal Co. v. Clark Equip. Co.*, 543 So.2d 671, 674–75 (Ala.1989) (Jones, J., dissenting). We reject an approach based on a distinction between the consumer and commercial contexts.

9. The distinction between consumer and commercial purchasers discussed above at footnote 8 also fails to support tort's safety rationale: potentially dangerous products *"are just as dangerous to the public when in the hands of a commercial or industrial user as they are in those of an individual consumer."* *McGraw–Edison*, 834 P.2d at 985 (Opala, C.J., dissenting).

The Supreme Court's second point is that our "potentially dangerous" formulation is "too indeterminate." We think, however, that any gain in certainty from a per se rule against economic loss is bought at too high a price: decreased safety and consumer protection. *See id.* (*East River*'s "increased certainty comes at too high a price.").

Second, PWC urges that *East River* steers a better course between contract law and tort law. We disagree. Under *East River*, many consumers like Sheehan not only would be denied a remedy in tort, but many also would be deprived of a remedy in contract since a product may not be covered by a warranty or the warranty may be limited. In the instant case, the warranty period has expired and the warranty by its terms disclaimed any other liability for "contract, delict or tort, whether or not arising from Seller's negligence." The superior court in its Summary Decision and Order rejected the notion that PWC should be allowed to so restrict Sheehan's remedies:

> When the Alaska Supreme Court adopted strict liability for products in *Clary v. Fifth Avenue Chrysler Center, Inc.*, 454 P.2d 244, 249 (Alaska 1969), the court indicated that unlike warranties such liability could not "be stipulated away." That is also the view expressed in comment *m* to section 402A of the Restatement (Second) of Torts (1965) (the cause of action "is not affected by any disclaimer or other agreement"). Moreover, it does not make sense to permit a disclaimer of strict liability. The essential public policy on which strict liability is built is the spreading of risk and ensuring that a manufacturer who is able to absorb loss and spread it is held liable rather than the consumer for whom loss may be catastrophic.

(Citations omitted.) *East River*, then, fails to protect consumers who lack equal bargaining power and who, thus, are inadequately protected under warranty or contract law. The Washington Supreme Court expressed a similar concern in *Washington Water Power v. Graybar Elec.*, 112 Wash.2d 847, 774 P.2d 1199 (1989): "If manufacturers can contract successfully around liabilities for product injuries, a principal *deterrent to unsafe practices*—the threat of legal liability—will be lost." *Id.*, 774 P.2d at 1209 (emphasis added). As the Washington court noted, consumer protection and manufacturer accountability are essential elements of the guiding principle of our strict products liability cases: *safety.*

Third, we do not share PWC's view that the law evidences a clear trend toward the rule in *East River.* The case law and commentary on economic loss and strict products liability reveal a diversity of opinion. Many courts that have adopted *East River* have split sharply on the issue and have done so over vigorous dissents. *See, e.g., Sharp Bros. Contracting Co. v. American Hoist & Derrick Co.*, 703 S.W.2d 901 (Mo.1986) (4–3 decision); *National Union Fire Ins. Co. v. Pratt & Whitney Canada, Inc.*, 107 Nev. 535, 815 P.2d 601 (1991) (3–2 decision); *McGraw–Edison*, 834 P.2d 980 (6–3 decision); *Continental Ins. v. Page Eng'g Co.*, 783 P.2d 641 (Wyo.1989) (4–1 decision). Some commentators and courts locate *East River* as the rule with a numerical majority of adherents. *See e.g., Utah Int'l Inc. v. Caterpillar Tractor Co.*, 108 N.M. 539, 775 P.2d 741, 744 (App.1989); 6 Stuart M. Speiser *et al., The American Law of Torts* § 18:140, at 179 (1989). Conversely, at least one commentator cites the intermediate position as the majority rule. *See* 2 M. Stuart Madden, *Products Liability* § 22.23, at 340 (2d ed. 1988). And, in a thorough discussion of the law in this area, Justice Urbigkit of the Wyoming Supreme Court argued forcefully that the intermediate approach, not the rule of *East River:*

> [Reflects] not only the developing direction of case law but socially appropriate engineered philosophy directed toward better product and a safer environment. Neither the pure *East River* idiom nor its half of a loaf commercial transaction offspring as a minority posture deserve adaptation for either consumer or commercial purchasers in this jurisdiction. Confining recovery to con-

tractual remedies makes no real sense.... Sometimes by fortuity, other property or personal injury will not result but, unfortunately, fortuity is not continuity and with faulty and dangerous products, there will inevitably be injury and other property damage in time.

*Continental,* 783 P.2d at 684–85 (Urbigkit, J., dissenting) (footnote omitted). These authorities illustrate the diversity of opinion on this issue.[10] Our analysis persuades us that *Northern Power* struck the proper balance between contract law and tort law; the diversity of opinion in the case law and commentary do not persuade us otherwise.

### C. Conclusion

We are not persuaded that the line *Northern Power* drew between tort and contract was originally erroneous. Thus, we reaffirm the "intermediate" approach we adopted based on the potential danger posed by the defect when that danger results in damage to the product itself.

## II. CIVIL RULE 82 ATTORNEY FEES

■ In *Sherry v. Sherry,* 622 P.2d 960, 966 (Alaska 1981), we held that a prevailing party attorney appearing *pro se* could receive attorney fees under Civil Rule 41(a)(2). Such fees cover time expended as an attorney active in the litigation, but not time expended as the client. *Id.* In *Burrell v. Hanger,* 650 P.2d 386, 387 (Alaska 1982), we extended the reasoning of *Sherry* to *pro se* attorney litigants seeking attorney fees under Civil Rule 82(a). PWC asks us to reconsider whether a *pro se* attorney

litigant may recover Rule 82 fees and, upon reconsideration, to overrule our decision in *Burrell.*[11]

PWC contends that the policy factors articulated in *Alaska Federal Savings & Loan Ass'n of Juneau v. Bernhardt,* 794 P.2d 579 (Alaska 1990),[12] which factors we concluded bar *pro se* litigants from receiving Rule 82 attorney's fees, are applicable to *pro se* attorney litigants. In deciding *Bernhardt,* we expressed no opinion regarding Rule 82 fees for *pro se* attorney litigants: "We have previously allowed prevailing attorney *pro se* litigants attorney fees for the time spent performing legal tasks, as distinguished from time spent as a client in the matter. Neither party asks us to reconsider *Sherry;* thus we decline to do so." *Bernhardt,* 794 P.2d at 581 n. 2. In awarding Sheehan Rule 82 fees, the superior court stated:

> [T]he rule permitting the recovery of attorney fees by *pro se* attorney litigants is well founded. An attorney has expended considerable time and effort in obtaining the skills necessary to practice law. Whether those skills are directed to the representation of others or oneself, the attorney skills and time have a clear marketable value. None of the policy reasons given by the court in *Bernhardt* to deny lay *pro se* litigants attorney fees are applicable to attorneys who represent themselves.

We agree that *Bernhardt*'s policy factors are not directly applicable to *pro se* attorney litigants. Thus, we are not persuaded *Burrell* should be overruled.

---

**10.** *See generally* Jay M. Zitter, Annotation, *Strict Products Liability: Recovery for Damage to Product Alone,* 72 A.L.R. 4th 12 (1989 & Supp. 1992) (collecting cases on the issue).

**11.** Sheehan contends that PWC's characterization of him as a *pro se* attorney litigant is incorrect. Sheehan maintains that he was represented by the Parrish Law Office to some extent, and consulted with that firm "on all of the pleadings, except for those of an elementary nature." We need not address Sheehan's contention, however, since we affirm the superior court on the basis of our decisions in *Sherry* and *Burrell.*

**12.** The *Bernhardt* policy factors include:

(1) the difficulty in valuing the non-attorney's time spent performing legal services, *i.e.,* the problem of overcompensating *pro se* litigants for "excessive hours [spent] thrashing about on uncomplicated matters," (2) the danger of encouraging frivolous filings by *pro se* litigants and creating a "cottage industry" for non-lawyers, (3) our view that the express language of Civil Rule 82 specifying "*attorneys* fees" is not easily susceptible to a construction allowing awards to non-attorneys, and (4) the argument that, in cases where a litigant incurs no actual fees, the award amounts to a penalty to the losing party and a windfall to the prevailing one.

*Bernhardt,* 794 P.2d at 581 (citations omitted).

## III. PRE– AND POST–JUDGMENT INTEREST [13]

### A. Multiple Rule 68 Offers

■ Before trial, Sheehan made four simultaneous offers of judgment to PWC. PWC argues that Civil Rule 68 [14] unambiguously prohibits multiple offers of judgment.[15] Under this argument, Sheehan would not be entitled to the enhancement of prejudgment interest the superior court awarded under Rule 68(b)(2) and AS 09.30.-065.

PWC argues that the main purpose of Rule 68 is to allow the offeree ten days to consider an offer of judgment. By submitting simultaneous offers, PWC contends that Sheehan was trying to impose a greater burden than that contemplated by the rule. The superior court rejected this argument, concluding that "there is no such restriction in the rule and that where, as here, the offers made were not burdensome and were closely related, the fact that multiple offers were made does not preclude application of Civil Rule 68." We agree with the superior court's reading of Rule 68. The text of the rule does not preclude simultaneous offers. Sheehan sent a letter of intent with the multiple offers and suggested that PWC should advise if the offers were confusing.[16] PWC did not respond. We do not view Sheehan's attempts to settle as improperly burdensome to PWC. *See Rules v. Sturn,* 661 P.2d 615, 616 (Alaska 1983) ("The purpose of Civil Rule 68 is to encourage settlement in civil cases and to avoid protracted litigation."); *see also Continental Ins. Co. v. U.S. Fidelity & Guar. Co.,* 552 P.2d 1122, 1125–26 (Alaska 1976).

### B. Enhanced Post–Judgment Interest

■ Since Sheehan's recovery exceeded one of the offers of judgment which he made, the superior court awarded Sheehan post-judgment interest at the enhanced rate of 15.5% per annum from June 18, 1990 until the judgment is paid in full. PWC contends that AS 09.30.065 only enhances the interest rate "up to the date the

---

**13.** Both parties agree that these issues are issues of law subject to *de novo* review. For our standard on *de novo* review, see footnote 2 above.

**14.** Civil Rule 68 provides in pertinent part:

(a) At any time more than 10 days before the trial begins, either the party making a claim or the party defending against a claim may serve upon the adverse party an offer to allow judgment to be entered in complete satisfaction of the claim for the money or property or to the effect specified in the offer, with costs then accrued. The offer may not be revoked in the 10 day period following service of the offer. If within 10 days after service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service, and the clerk shall enter judgment. An offer not accepted within 10 days is considered withdrawn and evidence of the offer is not admissible except in a proceeding to determine costs. The fact that an offer is made but not accepted does not preclude a subsequent offer.

(b) If the judgment finally rendered by the court is not more favorable to the offeree than the offer, the prejudgment interest accrued up to the date judgment is entered shall be adjusted as follows:

. . . .

(2) if the offeree is the party defending against the claim, the interest rate will be increased by the amount specified in AS 09.-30.065.

**15.** PWC also argues that if we deny Sheehan Rule 82 attorney fees, that action would reduce Sheehan's actual judgment below his offer of judgment. On this argument, we would have to reverse the superior court's award of enhanced prejudgment interest. Our holding that the superior court did not err in awarding Sheehan Rule 82 attorney fees moots PWC's argument.

**16.** The superior court summarized these four offers as follows:

After remand of the case, Sheehan made four offers of judgment on September 22, 1989. The four offers of judgment made September 22 were essentially in two groups. Offer Nos. 1 and 3 are in the amount of $311,325.34, which 'includes court awarded costs then accrued and attorney fees....' Offer No. 1 was made to defendants Pratt & Whitney Canada, United Technologies, and Pratt & Whitney. Offer No. 3 was made to Kerstetter. Offer Nos. 2 and 4 were in the amount of $190,-225.34 plus specified engine and parts. Offers 2 and 4 went to Pratt & Whitney and Kerstetter respectively. Sheehan argues that the penal cost provisions of Civil Rule 68(b) are applicable because the judgment finally rendered will not be more favorable to the offeree than the offeror.

judgment is entered" and thus does not apply to post-judgment interest. AS 09.30.-065 provides in part:

> If the judgment finally entered on this claim as to which an offer has been made under this section is not more favorable to the offeree than the offer, the *interest* awarded under AS 09.30.070 and *accrued up to the date judgment is entered* shall be adjusted as follows....

AS 09.30.065 (emphasis added). We agree with PWC that the unambiguous phrase "accrued up to the date judgment is entered" limits any interest enhancement to prejudgment interest. Accordingly the superior court's award of enhanced post-judgment interest is reversed.

### C. Prejudgment Interest on Value of Plane

■ In his cross-appeal, Sheehan argues that he is entitled to prejudgment interest on the pre-accident fair market value of his plane, calculated from the time of the accident through the date the plane was returned to him in airworthy condition. PWC contends that the entire value of the airplane is irrelevant because where, as here, the damaged item can be economically repaired the appropriate measure of damage is the reasonable costs of repair. The superior court found:

> [There is] no support for Sheehan's argument that at his election he may recover prejudgment interest on the entire value of the airplane prior to the crash. Sheehan could have proven any loss of use damages at trial. He chose not to do so. A unilateral substitution of prejudgment interest on a total constructive loss theory is not permitted.

We agree with the superior court. We have found no authority for awarding prejudgment interest on the full value of the damaged goods in addition to repair damages alleged in the underlying claim. Since Sheehan did not raise the issue of "loss of use damages" at trial, we affirm the superior court's disposition of this issue.

### D. Prejudgment Interest on Money Advanced to Repair Plane

■ Sheehan made three cash advances which Viking Air, Ltd., required for repair of his plane. The funds for these advances were withdrawn from time certificates of deposit. Sheehan argues that the sums advanced should be considered costs associated with mitigating his damages and thus subject to prejudgment interest. PWC responds that prejudgment interest on the advanced funds would allow Sheehan a double recovery of prejudgment interest: "interest on the amount of stipulated damages, plus interest on the payments which comprised those damages." The superior court agreed with PWC on this issue, reasoning that:

> Although Sheehan expended the funds in order to mitigate his losses, he is compensated for the interest which he lost from certificates of deposit by prejudgment interest. To illustrate the point, consider if Sheehan had repaired the plane on the day following the accident. On that circumstance, he would still have been entitled to prejudgment interest on the full amount of the damages which he paid. However, it would be for loss of use of the money. Similarly here, where Sheehan expended some money for some of the repairs, he is entitled to be compensated only once for loss of use of the money.

Since prejudgment interest on Sheehan's other damages runs from the date his cause of action accrued, we hold that he has been compensated for the full value of the repairs from the date of the loss. Thus, we affirm the superior court's decision.

### IV. EXPERT WITNESS FEES

■ On cross-appeal, Sheehan challenges the superior court's denial of his request for expert witness fees. Sheehan argues that he is entitled to such fees under Administrative Rule 7(c). We have held that Administrative Rule 9(c), which since has been recodified as Rule 7(c), allows an award of expert witness fees only for "the time the expert *was actually testifying.*" *Eagle Air, Inc. v. Corroon & Black/Daw-*

*son & Co.,* 648 P.2d 1000, 1007 (Alaska 1982) (emphasis added). Because none of Sheehan's expert fees were incurred in conjunction with the trial, they are not recoverable under Administrative Rule 7(c). *See Miller v. Sears,* 636 P.2d 1183, 1195 (Alaska 1981).

### CONCLUSION

We **AFFIRM** the judgment of the superior court in all respects, except for its award of enhanced post-judgment interest. As to that issue, the superior court is **REVERSED.**