UNITED STATES AVIATION UNDER-WRITERS, INC., a New York corporation; Paul Leadabrand, an Idaho resident; and Jeflyn Aviation, Inc. dba Access Air, an Idaho corporation, Plaintiff,

v.

PILATUS BUSINESS AIRCRAFT, LTD, a Colorado corporation; Pilatus Flugzeugwerke Aktiengesellschaft, a Swiss corporation, Pilatus Aircraft, Ltd, a Swiss corporation; Pratt & Whitney Canada, Inc., and Does 1 through 500, Inclusive, Defendants.

No. CIV.A. 01–K–2056.

United States District Court,
D. Colorado.

Feb. 28, 2005.

Jon A. Kodani, Law Offices of Jon A. Kodani, Santa Monica, CA, for Plaintiffs.

Robert B. Schultz, Atty at Law, Arvada, CO, Thomas J. Byrne, Byrne, Kiely & White, Denver, CO, for Defendants.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

KANE, District Judge.

This products liability action arises out of the mid-flight failure of an airplane engine over the Sea of Okhotsk, approximately 200 miles off the eastern coast of Russia, resulting in an emergency water landing and the ultimate rescue of the pilot and his three Japanese citizen passengers from their floating life raft. At the time the engine failed, the airplane was cruising at an altitude of 27,000 feet. The airplane presumably sank to the bottom of the Sea of Okhotsk, and has never been recovered.

The plane, a Pilatus model PC–12/45, was designed and manufactured by Swiss entity Pilatus Flugzeugwerke Aktiengesellschaft ("Pilatus AG"), and was fitted with a model PT6A–67B airplane engine designed and manufactured by Pratt & Whitney Canada, Inc. ("Pratt & Whitney"). Through a series of transactions in Europe and the U.S., the aircraft was purchased by nonparty DJS Aviation, LLC, and leased to Plaintiff Jeflyn Aviation, Inc., dba Access Air ("Access Air").[1] At the time of the accident, Access Air was operating the aircraft as an around-the-world charter on a leg from Hakodate, Japan to Magadan, Russia. The aircraft was insured by Plaintiff United States Aviation Underwriters, Inc. ("USAU"), and after the crash Access filed insurance claims with USAU arising out of the loss of the airplane and owner Paul Leadabrand's personal property, which was on board at the time the airplane went down. USAU paid these claims, and Access assigned any rights of action arising out of the crash to USAU.

---

1. Specifically, it appears the airplane was sold by Pilatus AG to Colorado-based Pilatus Business Aircraft, Ltd., USA, in Broomfield, Colorado, where it underwent necessary checks and/or modifications for FAA certification. Pilatus USA then sold the aircraft to its regional distributor Western Aircraft, Inc. ("Western"), which, in turn, sold it to DJS.

Invoking USAU's rights of subrogation and assignment, USAU and Leadabrand commenced a products liability action against Pratt & Whitney and a number of its affiliated entities identified as Does 1–100, as well as the various Swiss and U.S. Pilatus entities involved in the manufacture, installation, repair/modification, and sale of the airplane and its engine together with affiliated entities Does 101—500. Plaintiffs assert claims for strict liability under the Colorado Product Liability Act, Colo.Rev.Stat. §§ 13–21–401 et seq., and for negligence, seeking "to recover for, or on account of, personal injury or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of [the engine and aircraft]."[2] Because Access suffered no loss other than the manufactured product(s) themselves, which were under warranty, Defendants contend Plaintiffs' tort claims are barred as a matter of law.

The case is before me on Defendant Pratt & Whitney's Motion for Summary Judgment. The Pilatus Defendants join in the Motion. Pratt & Whitney's Motion originally invoked Colorado law to argue Plaintiffs' tort claims are barred under *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256 (Colo.2000), which provides that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care in tort. Specifically, Pratt & Whitney argued that the only duties it owed Access and Leadabrand arose from the sale of the engine as set forth in its express warranty regarding engine defects and workmanship. Because Pratt & Whitney owed no tort duty to Plaintiffs independent of the reasonable care promised under the warranty, it argued USAU's tort claims are barred under *Town of Alma* where the only loss suffered was economic.

After the Pilatus Defendants in their Joinder raised the specter that admiralty, rather than Colorado, law should supply the legal standards in this case, Pratt & Whitney adopted that position and argued *East River, et al. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) provided the most appropriate source for the economic loss rule at issue. Citing *East River*, Pratt & Whitney agreed Plaintiffs' tort claims must be dismissed "because a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." Pratt & Whitney Reply at p. 5 (citing *East River* at 870, 106 S.Ct. 2295).

Having considered fully the record in this case, the parties' arguments and the applicable legal authorities, I reject Defendants' interpretation of *East River* and the assertion that the economic loss rule bars Plaintiffs' tort claims. I conclude that under the circumstances of this case, Colorado courts would recognize a claim for strict products liability and negligence and I disagree with Pratt & Whitney and Pilatus that *East River* would compel a different conclusion were I to apply admiralty, rather than Colorado, law.

1. *The warranties.*

Both the engine and the Pilatus aircraft in which it was installed were the subject of separate express warranties which Defendants contend ran through the chain of manufacture, installation, modification and resale from Pilatus AG in Switzerland to

---

**2.** The related personal injury action of the pilot and passengers involved in the crash, No. 03–K–1209, was filed two years later and is consolidated with the products liability action for purposes of discovery.

Access Air, as DJS's lessee. The Pratt & Whitney engine warranty provides coverage for "2500 Engine operating hours or 5 years from the date of delivery," and warrants that, "at the time of delivery to the original operator, your new Engine will be free from defects[3] in material and/or manufacturing workmanship and will conform to the applicable P & WC specification." Pratt & Whitney Canada Enhanced Warranty for New Engines and Service Policies (Ex. A–7 to Pratt & Whitney's Mem. Br. Support Mot. Summ. J.) at 3. The warranty further provides that Pratt & Whitney will "repair or replace any Engine parts found to be defective (as defined above), including resultant damage to your Engine, during the [coverage period]," and "will pay reasonable removal and reinstallation labour for your Engine." *Id.* It expressly excludes coverage "for parts that have been involved in an accident and where subject parts' or Engine's failure is attributable to that part." *Id.*

The Pilatus Aircraft Ltd. PC–12 New Aircraft Limited Warranty appears in the record both as a stand-alone document executed by Don Simplot of DJS (Ex. B–4 to Pilatus Defs.' Joinder in Summ. J. Mot. of Pratt & Whitney) as well as embedded in the Aircraft Purchase Agreements between Pilatus USA and Western Air (*id.,* Ex. B–1) and Western Air and DJS (Ex. B–2). The stand-alone Pilatus Ltd. warranty provides that the aircraft "is free from defects in material and workmanship for a period of (a) the earlier of seven (7) years or five thousand (5,000) flight hours for Aircraft components manufactured by Pilatus, (b) two (2) years for exterior paint and interior furnishings manufactured by Pilatus, and (c) the earlier of two (2) years or two thousand (2,000) flight hours for all vendor items and accessories supplied by Pilatus . . . ." (Ex. B–4, p.2) Pilatus's "sole obligation under th[e] warranty is to replace or repair the component(s) to an airworthy condition in accordance with Pilatus' technical and design specifications, and to reimburse reasonable removal and reinstallation labor costs incurred by Pilatus Authorized Service Centers," and the warranty expressly excludes from coverage "any Aircraft accessory or item of equipment which has been subject to misuse, negligence, unauthorized alteration or accident." *Id.* Substantively identical provisions appear in the respective purchase agreements between Pilatus USA/Western Air and Western Air/DJS, except the sellers in those agreements (Pilatus USA and Western) also warrant that the aircraft conforms to the specifications set forth in a separate Exhibit A (*see e.g.* Pilatus USA Agreement ¶ 4(a)).

A February 13, 2001 letter from Pratt & Whitney to Pilatus USA warranty administrator Kathy Bormuth confirms the Pratt & Whitney warranty in favor of DJS as of the date of delivery of the aircraft on December 21, 2000 (Ex. A–9).

■ It should be mentioned that both warranties include broad disclaimers of tort liability based on the sale, use, or manufacture of the products.[4] General

---

**3.** In a footnote at this place in the warranty, Pratt & Whitney defines "defect" as "the breakage or failure of a part which is determined to P & WC's satisfaction to be due to defects in material and/or manufacturing workmanship."

**4.** For example, the stand-alone warranty between Pilatus Ltd. and DJS expressly disclaims

ANY OBLIGATION OR LIABILITY, WHETHER FOR NEGLIGENCE, STRICT LIABILITY, PRODUCT LIABILITY OR OTHERWISE, INCLUDING LOSS OF USE, INCONVENIENCE, COMMERCIAL LOSS, OR OTHER DIRECT OR INDIRECT, INCONSEQUENTIAL, INCIDENTAL, GENERAL OR SPECIAL DAMAGES, BY REASON OF THE MANUFACTURE, MARKETING, SALE, LEASE, OR USE OF ANY AIRCRAFT, PART, COMPONENT OR SERVICE.

disclaimers of this sort are disfavored and enforceable only if specifically agreed to in negotiations between a commercial seller and commercial buyer. *See Hügel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983, 989–90 (1975). Because neither set of Defendants relies on an assertion the disclaimers are binding, I do not address the issue further.

2. *Neither the Pratt & Whitney nor Pilatus warranty bars Plaintiffs' negligence and strict products-liability claims by operation of the economic loss rule under either Colorado or federal admiralty law.*

■ Even assuming, for purposes of summary judgment, that the respective warranties ran through the chain of ownership from Pratt & Whitney and PilBal to DJS and to Access Air,[5] I conclude neither operates to bar the tort claims brought by USAU in this case. USAU's insured did not purchase the defective engine or aircraft in a commercial transaction and did not bargain for any rights or obligations in either warranty. Even if it had, the benefit of such a bargain would have been compensation for economic loss, meaning, compensation *for* diminution in value as measured by repair costs, decreased value and lost profits. The loss of the aircraft is more than damage to the warrantied "product" or products themselves, and neither federal nor state law supports the contrary assertion of Defendants. Where, as here, the loss extends beyond the economic risks allocated by contract to include the physical loss of the end product in which warrantied components were installed, the economic loss rule does not limit a plaintiff's action to one under those warranties. Instead, the plaintiff may assert a cause of action for negligence or strict liability based on Defendants' breaches of duties not to inject defective products into the stream of commerce.

■ Distinguishing *Town of Alma,* I disagree Access Air's loss is "purely" economic in this case or solely the result of the engine or other component parts' failure to live up to their bargained-for levels of workmanship or performance. Instead, I agree that the Restatement (Second) Torts § 402A gives rise to duties independent of those manufacturers may choose to assume or disclaim in a warranty, which duties are implicated here. In *Town of Alma,* the Colorado Supreme Court engaged in a historical analysis of Restatement § 402A and the development of the economic loss rule—in Colorado and nationwide—representing courts' efforts to prevent tort law from "swallowing" the law of contracts in products liability cases. Along the way, the Colorado Supreme Court explored seminal cases such as *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 151 (1965) and *East River,* concluding the economic loss rule serves to bar negligence and strict liability claims where economic damage is caused by the breach of a duty voluntarily assumed in contract and which results from a failure of the purposes or expectancies under that contract. *Town of Alma,* 10 P.3d at 1261–62. Where a plaintiff's loss exceeds the limits of those expectancies, or is the result of a breach of duties arising independently of the contract, however, the rule does not apply. *Id.* at 1262–64. Both circumstances exist in this case.

---

**5.** A conclusion, I note, that is both fact-driven and potentially immaterial if the warranties are deemed inapplicable to Access Air for any other reason. *See* Pratt & Whitney Engine Warranty at p. 6 *and* PilBal Warranty ¶ 4(e). *See also* 192 F.Supp.2d 1175, 1181–82 (D.Colo.2002)(the question of the existence of a warranty and whether that warranty was breached is ordinarily one for the trier of fact). For purposes of the instant Motion, however, I will assume the warranties apply both to USAU standing in the shoes of Access Air as well as to Leadabrand.

First, the aircraft at issue did not land and require engine or chassis repair. The effect of the failure of the engine to meet the level of quality "bargained for" in the warranty was not to cause a diminution in the value of the whole as measured by the cost of a necessary repair, but the loss of the entire airplane. *C.f. Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 374 S.E.2d 55, 58 (1988)(cited in *Alma* at 1264)(where the effect of the failure of substandard parts to meet bargained-for level of quality was to cause diminution of value of whole as measured by the cost of repair, law of contract provides the sole remedy). Pratt & Whitney's characterization of this loss simply as damage to the warrantied product itself is unpersuasive.

Second, the Court's distinction in *Town of Alma* between bargained-for expectations of repairing damage or replacing parts and expectations that products will not damage persons or property beyond what is bargained for is consistent with the purposes underlying § 402A and the application of § 402A in *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975). In *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1443 (10th Cir.1992), the owner of a helicopter sued the manufacturers of the helicopter and the helicopter engine after a fatal crash. Citing *East River*, the manufacturers asserted the owner should have been limited to a cause of action under warranty because its loss were simply the value of its product. *Id.* The Tenth Circuit rejected the manufacturers argument, distin-guishing *East River* and holding that under the Colorado Supreme Court's decision in *Hiigel*, the owner was not limited to a claim under the warranties and could state a cause of action under § 402A. *Id.* at 1443–44.

Pratt & Whitney spends considerable time in its briefing deconstructing *Hiigel* and urging *East River* as the superior statement of the economic loss rule. I find the argument unnecessary, as a close reading of *East River* reveals it to be consistent both with *Hiigel* and my conclusions on the issues raised in Defendants' Motions for Summary Judgment.[6]

In *East River*, operators of oil supertankers sued the manufacturer of turbines used for ship propulsion after the turbines malfunctioned. 476 U.S. at 861, 106 S.Ct. 2295. The operators sought damages for the cost of repairing the turbines and for income lost while the ships were out of service. *See id.* The Supreme Court rejected the operators' claim, holding no cause of action in tort could lie for damage caused when a product malfunctions and damages only itself. *Id.* at 876, 106 S.Ct. 2295. The Court's focus in reaching this conclusion was less on the nature of the damage to the "product itself" in terms of being physical or purely economic, and more on the extent to which the law will defer to parties' private allocation of risk in products liability cases. Reading closely, it is clear equality of bargaining power and meaningful allocation of risk are touchstones of the Court's analysis.

---

**6.** In this regard, I find the Tenth Circuit's assertion in *Turbomeca* that Colorado law "does not support" *East River* both unfortunate and unnecessary, and in a manner presages the Colorado Supreme Court's efforts to clarify the issue eight years later in *Alma*. The panel in *Turbomeca* accepted defendants' characterization that *East River* prohibits tort liability where a defective product under war-ranty causes only economic loss, and rejected that characterization as inconsistent with *Hiigel*. By focusing away from the nature of the loss in cases on the cusp of the tort/contract continuum and toward the underlying purposes of the contract, the Court in *Alma* reconciles *Hiigel* and *East River* and provides a template for the analysis to apply in this case.

"Products liability," the Court explains, "grew out of a public policy judgment that people need more protection from dangerous products than is afforded by the law of warranty." 476 U.S. at 866, 106 S.Ct. 2295. Allowed to progress "too far," however, this development risked "drown[ing]" contract law "in a sea of tort." *Id.* Setting out to define where tort law should yield, the Court observed that

> [w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong. The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the 'cost of an injury and the loss of time or health may be an overwhelming misfortune' ... the person is not prepared to meet. [Citations omitted.] In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured [through express and implied warranties] ... [and] society need not presume that a customer needs special protection.

*East River,* 476 U.S. at 871–72, 106 S.Ct. 2295.

> The Court went on to explain that
> [c]ontract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. [Citing UCC §§ 2–316, 2–719.] In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargain-

ing power ... we see no reason to intrude into the parties' allocation of risk. *East River* at 872–73, 106 S.Ct. 2295. In the instant case, the applicability of *East River* in the first instance may be in doubt given that the "injury" at issue went beyond the engine or individual airplane components to the entire aircraft itself. *See Turbomeca,* 979 F.2d at 1443. Even if *East River* provided an apt analogy, however, the fact that Access Air was the end-user of an airplane it did not purchase in a commercial transaction with manufacturers but leased from a third party militates against limiting it to recovery under the warranties. Access Air did not bargain with any of the aircraft or engine manufacturers, did not negotiate price concessions in exchange for limitations on liability and did not accept or allocate any risks. It succeeded, if at all, to very limited warranties for the repair or replacement of airplane parts. Under the circumstances of this case, I conclude the mid-flight failure of the aircraft's engine over the Sea of Okhotsk is the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation. *Accord Pratt & Whitney Canada, Inc. v. Sheehan,* 852 P.2d 1173 (Alaska 1993)(overruling earlier per se ban on recovery for damage solely to product itself on grounds that mid-flight engine failure "paradigmatic example" of dangerous situation for which economic loss is recoverable).

Accordingly, Pratt & Whitney's Motion for Summary Judgment, in which the Pilatus Defendants join, is **DENIED**. Plaintiffs may maintain their tort claims against Defendants, and are not bound by the remedies contemplated or disclaimed in the warranties. Liability would be limited to the value of the lost aircraft, and would not include recovery for commercial or business loss.

Counsel shall file a status report in this and related case 03–K–1203 on or before March 18, 2005. This case will be set for pretrial conference thereafter, if necessary.