**STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellant/Cross–Appellee,**

**v.**

**Donald H. CARLSON; Warren Hart; Gerard Haskins; Earl Weese; and Lyla C. Weese, Individually and as Class Representatives on Behalf of All Persons Similarly Situated, Appellees/Cross–Appellants.**

Nos. S–10091, S–10101.

Supreme Court of Alaska.

March 14, 2003.

---

Stephen M. White, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant/Cross–Appellee.

Loren Domke, Loren Domke, P.C., Juneau, for Appellees/Cross–Appellants.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Chief Justice.

## I. INTRODUCTION

This is the third appeal arising out of a lawsuit centering on whether Alaska can charge nonresidents more for commercial fishing licenses than it charges resident commercial fishers. The case is brought as a class action by a group of nonresident commercial fishers. In previous rulings in this

case, we held that different rates can be charged for resident and nonresident commercial fishers, and we derived a formula for calculating the acceptable difference. The components of this formula, including various budget expenditures and oil revenues, are in dispute in this appeal. We conclude that direct and indirect costs associated with the fisheries budget and costs associated with the hatcheries loan fund can be included in the calculation of the allowable fee differential. We further hold that at an earlier stage in this litigation the State conceded that the protest requirement for recovery of overpayment of taxes has been satisfied. Finally, we hold that prejudgment interest will be applicable if on remand it is determined that a refund of a portion of fees is required.

## II. FACTS AND PROCEEDINGS

Litigation in this case began in 1984. At the time this case was first before this court, nonresident commercial fishers were charged three times as much as resident fishers for fishing license fees.[1] The relevant statute at the time, AS 16.05.480(a), dealt primarily with authorizing the establishment of fees for commercial fishing: "A person engaged in commercial fishing shall obtain a commercial fishing license. The fee for the license is $30 for residents, and $90 for nonresidents." The relevant current statute, AS 16.05.480(h), establishes: "For a crewmember fishing license [2] issued for calendar year 2002 and following years, a nonresident engaged in commercial fishing who is 11 years of age or older and who does not hold an entry permit or an interim-use permit shall pay an annual base fee of $60 plus an amount, established by the department by regulation, that is as close as is practicable to the maximum allowed by law." The principal difference is that the current statute does not set the amount which nonresidents can be charged, but rather allows this amount to be set at the

---

1. *Carlson v. State, Commercial Fisheries Entry Comm'n (Carlson I )*, 798 P.2d 1269, 1270 (Alaska 1990).

2. "Crewmember fishing license" and "commercial fishing license" are used interchangeably in

AS 16.05.480 with no apparent distinction made between the two. A "commercial fisherman" is elsewhere defined to include crewmembers. AS 16.05.940(4).

maximum legal amount.[3]

A similar fee structure is established for entry permits and interim-use permits where the creation of limited use zones is deemed necessary for controlling, through the permitting process, the number of people who can fish in a given geographic area.[4] However, in 2001 the fees for nonresidents were three times the amount for residents.[5] Crewmembers are not required to have entry or interim-use permits, although they are required to have a commercial (crewmember) fishing permit to work on a permit vessel.[6] The class never specifically stated in its brief that it is challenging both commercial fishing licenses and entry permit fees, but one of the challenged superior court orders states that it applies to both "commercial licenses and limited entry permits." Furthermore, *Carlson I* defined the class as consisting of "all persons who participated in one or more Alaska commercial fisheries at any time who

paid non-resident assessments to the State for commercial or gear licenses or permits." [7] This language was taken directly from the initial complaint. We therefore find it appropriate to address both commercial fishing licenses and entry permit fees. For the sake of simplicity, the two will be referred to collectively as "commercial fishing fees," except in those instances where it is necessary to differentiate between the two.

## A. Prior Case History Before the Alaska Supreme Court

Before proceeding with the issues in the present case, it is helpful to review the decisions in the previous appeals before this court. In *Carlson I*, we held that different fees for residents and nonresidents did not automatically violate either the Privileges and Immunities Clause or the Commerce Clause of the United States Constitution.[8] We noted that "[l]ess favorable treatment by

---

**3.** This amount is to be set by the Alaska Commercial Fisheries Entry Commission. AS 16.43.100(16) (authorizing commission to "establish reasonable user fees for services").

**4.** *See generally* AS 16.43.200–.225.

**5.** The relevant sections of former 20 Alaska Administrative Code (AAC) 05.240(a)(1), (2), (4) (2002) provide:

(a) For 2001, the commission will determine the annual fee for the issuance or renewal of an entry permit or interim-use permit according to the following:

(1) the resident annual fee for the issuance or renewal of an entry permit or interim-use permit in a limited fishery is .25 percent of the estimated value of the entry permit, rounded to the nearest fee class amount established in (4) of this subsection; the non-resident annual fee is three times this amount, as set out in (4) of this subsection; ...

(2) the resident annual fee for the issuance or renewal of an interim-use permit in an unlimited fishery is .25 percent of the estimated average gross earnings per permit in the most recent three years for which data are available, rounded to the nearest fee class amount established in (4) of this subsection; the non-resident fee is three times this amount, as set out in (4) of this subsection;

....

(4) the resident and non-resident annual fees are:

| FEE CLASS | ANNUAL FEE | |
| --- | --- | --- |
| | Resident | Non-resident |
| I | $250 | $750 |
| II | 200 | 600 |
| III | 150 | 450 |
| IV | 100 | 300 |
| V | 50 | 150 |

**6.** *See* AS 16.43.140(b) ("A permit is not required of a crewmember or other person assisting in the operation of a unit of gear engaged in the commercial taking of fishery resources as long as the holder of the entry permit or the interim-use permit for that particular unit of gear is at all times present and actively engaged in the operation of the gear."); AS 16.05.480(a) (2001) ("A person engaged in commercial fishing shall obtain a commercial fishing license and shall retain the license in possession and readily available for inspection during fishing operations. An entry permit or interim-use permit entitles the holder to participate as a gear operator in the fishery for which the permit is issued and to participate as a crewmember in any fishery."); AS 16.05.940(4) ("'[C]ommercial fisherman' means an individual who fishes commercially for, takes, or attempts to take fish, shellfish, or other fishery resources of the state by any means, and includes every individual aboard a boat operated for fishing purposes who participates directly or indirectly in the taking of these raw fishery products, whether participation is on shares or as an employee or otherwise."); AS 16.05.940(5) ("'[C]ommercial fishing' means the taking, fishing for, or possession of fish, shellfish, or other fishery resources with the intent of disposing of them for profit, or by sale, barter, trade, or in commercial channels.").

**7.** *Carlson I*, 798 P.2d at 1270.

**8.** *Id.* at 1274–78.

the state towards nonresidents runs afoul of the Privileges and Immunities Clause if: 1) the activity in question is 'sufficiently basic to the livelihood of the Nation ... as to fall within the purview of the [clause], *and* 2)[it] is not closely related to the advancement of a substantial state interest.'"[9] We proceeded to determine that "[c]ommercial fishing is a sufficiently important activity to come within the purview of the Privileges and Immunities Clause, and license fees which discriminate against nonresidents are *prima facie* a violation of it."[10] We recognized that states may "charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay."[11] Because the appropriateness of a 3:1 fee differential had not been addressed, we remanded the case for such a determination, placing the burden of persuasion on the State.[12]

We conducted a similar analysis with regard to the Commerce Clause. Noting that the Commerce Clause "limits the power of the States to erect barriers against interstate trade,"[13] we concluded that if a law is shown to discriminate against interstate commerce, either in its wording or in its effect, the burden is on the State "to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means."[14] We held that the superior court improperly relied upon *Salorio v. Glaser*[15] in granting summary judgment to the State.[16]

We determined that applying *Salorio,* in which New Jersey imposed additional fees on nonresidents to pay for transportation facilities,[17] to the present case would result in nonresidents subsidizing the activities of residents because nonresidents could then be required "to pay up to 100% of their *pro rata* share of expenditures regardless of what percentage of their *pro rata* share residents are in fact paying."[18] However, because the majority of the state revenues are derived from petroleum production, a source to which nonresident fishers make no contribution, we ruled that the State could recoup conservation expenditures from nonresidents in the form of differential fees.[19] We reasoned that the oil revenues spent on conservation "could have been used to benefit residents through various other programs and they are, analytically, equivalent to 'taxes which only residents pay.'"[20] In that the extensive use of oil revenues as a source for state expenditures created a greater financial burden on nonresidents than residents, a fee differential based upon residency was justified.[21] Consequently, "the state may equalize the economic burden of fisheries management; where residents pay proportionately more by way of foregone benefits than nonresidents for fisheries management, nonresidents may be charged higher fees to make up the difference."[22] This is the same conclusion that was reached in the Privileges and Immunities Clause analysis. Consequently, we remanded the case for a further determination of the appropriateness of the fees.[23]

9. *Id.* at 1274 (quoting *Supreme Court of Virginia v. Friedman,* 487 U.S. 59, 64–65, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988) (citations omitted)).

10. *Carlson I,* 798 P.2d at 1274.

11. *Id.* at 1274–75 (quoting *Toomer v. Witsell,* 334 U.S. 385, 399, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948)).

12. *Carlson I,* 798 P.2d at 1276, 1278.

13. *Id.* at 1277 (quoting *Maine v. Taylor,* 477 U.S. 131, 137, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)).

14. *Carlson I,* 798 P.2d at 1277 (quoting *Maine v. Taylor,* 477 U.S. at 138, 106 S.Ct. 2440).

15. 82 N.J. 482, 414 A.2d 943, *cert. denied,* 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 94 (1980).

16. *Carlson I,* 798 P.2d at 1278.

17. 414 A.2d at 953.

18. *Carlson I,* 798 P.2d at 1278.

19. *Id.*

20. *Id.*

21. *Id.*

22. *Id.*

23. *Id.* We made two other rulings in *Carlson I:* We held that the Commercial Fisheries Entry Commission was authorized by statute to impose different commercial fishing fees, assuming that the ratio itself was constitutional. *Id.* at 1278–

In *Carlson II*, we addressed the question of what would be an acceptable fee differential for nonresidents to pay.[24] We first affirmed our decision in *Carlson I* that neither the Commerce Clause nor the Privileges and Immunities Clause prevented the imposition of an increased fee for nonresident commercial fishers.[25] The class had argued that two cases, which held that states violated the negative (also known as dormant) Commerce Clause by charging greater taxes on out-of-state waste than on in-state waste, decided by the United States Supreme Court after *Carlson I* but before *Carlson II*, were applicable to the present case.[26] We distinguished these two cases by holding that the facts in the present case did not involve the "interstate flow of *articles of commerce*."[27] In response to the class's Privileges and Immunities Clause argument, we stated that we did not in *Carlson I* advance the type of fee-shifting arrangement denounced in *Oregon Waste Systems*, but rather explicitly held that nonresidents could be required to pay only that amount that would make their contribution to state-provided benefits substantially equal to the contribution of similarly situated residents.[28]

Accepting the constitutionality of the fee differences, we next determined a formula for allowable differences. We adopted the per capita fee differential formula advocated by the class as opposed to the pro rata formula offered by the State, holding that the allowable fee differential could be determined by: (Fisheries Budget/Alaska Population) X (percentage of State Budget from oil revenues/1.0).[29] We rejected the State's proposed formula [30] because it improperly compared the contributions made by nonresident commercial fishers to those made only by resident commercial fishers, rather than viewing the resource expenditures benefitting the nonresidents in terms of the population of the state as a whole: [31]

> Resident commercial fishers are paying the license and permit fees they are charged plus their *per capita* share of oil revenues which are diverted to fisheries management from other benefits or State services. It is this quantity which must be equivalent to the fee differential for the fees to be constitutional under the *Carlson I* analysis.[32]

We remanded the case to the superior court to determine if, under the formula adopted, the nonresident fee differential exceeded the resident contribution, including the forgone oil revenues of the average Alaska resident.[33] The superior court on remand was also to

79. We also remanded on the issue of whether the protest requirement in AS 43.15.010(a) had been met. *Id.* at 1279–80. We further noted on this issue that a two-year statute of limitations from the time the tax was paid governed instead of the six-year limit assumed by the superior court. *Id.* at 1280.

24. *Carlson v. State, Commercial Fisheries Entry Comm'n (Carlson II )*, 919 P.2d 1337 (Alaska 1996). Certiorari was subsequently requested but denied. 519 U.S. 1101, 117 S.Ct. 789, 136 L.Ed.2d 730 (1997).

25. *Id.* at 1340–42.

26. *Carlson II*, 919 P.2d at 1340 (citing *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 340–41, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992)).

27. *Carlson II*, 919 P.2d at 1340 (citing *Oregon Waste Sys.*, 511 U.S. at 98, 114 S.Ct. 1345).

28. *Carlson II*, 919 P.2d at 1340.

29. *Id.* at 1342–43.

30. The State had advocated the following pro rata formula: "(1) calculate the expenditures or costs of the commercial fisheries (enforcement and conservation); (2) determine the resident and nonresident commercial fishers' respective *pro rata* shares of those expenditures; and (3) compare the percentage of its respective *pro rata* share each group is paying." *Id.* at 1343.

31. A similar plan was rejected by the Fourth Circuit, which overturned a Virginia law that required all fishers to pay a fee determined by dividing the state costs of fishing funded by all taxpayers by the number of fishers in the state, requiring as a result that nonresident fishers pay an additional $1,150 fee. *Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264, 268 (4th Cir. 1993).

32. *Carlson II*, 919 P.2d at 1343.

33. *Id.* at 1344.

address what budget figures should be included in executing the formula.[34]

On the issues of refunds to the class and prejudgment interest, we recognized that "the record indicates that the State agrees that those fees which were paid after June 22, 1984, were paid under protest sufficient to permit a refund under AS 43.10.210."[35] The class admitted that it could not have satisfied the protest requirement before then and thus would not seek a refund for any fees prior to that date.[36] We remanded the case to determine if the action of filing suit constitutes sufficient notice to satisfy the requirements of AS 43.10.210(a)[37] and to determine whether, if the class ultimately prevails, prejudgment interest is due.[38]

### B. Recent Case History After Remand to the Alaska Superior Court

On July 17, 1998, Superior Court Judge Peter A. Michalski issued an opinion addressing class decertification and prejudgment interest. Judge Michalski denied the State's motion for class decertification because all four components of class certification—numerosity, commonality, typicality, and adequacy of representation—were met. The State had argued that because the class shifted its legal theory from common law theories of assumpsit to a statutory argument, the original class certification under Alaska Civil Rule 23(b)(2) must be reexamined. The State further argued that numerosity did not exist because only the named parties actually protested the fee differential; conceded that commonality existed; asserted that because different permits and fees were involved, there was no typicality of claims; and contended that the variety of remedies that the legislature could adopt if the fees were found

to be unconstitutional rendered it impossible for there to be adequacy of representation. The superior court held that the State did not provide a sufficient change in circumstances to justify decertifying the class and noted that speculation as to how the legislature might react to a ruling was also not grounds for decertification. Judge Michalski further ruled that the status of a class as a "unified legal entity" overrode the State's interest in making distinctions between class members. Consequently, the superior court concluded that "no distinctions will be made among class members when determining whether the state waived the protest requirement or whether the class met the protest requirement."

In addition, the superior court held that notice to the State existed as of December 13, 1984. The State had argued that every member of the class was required to protest to obtain any refund. However, Judge Michalski, quoting *Principal Mutual Life Insurance v. State, Division of Insurance*,[39] stated that the purpose of the protest requirement was to provide the State "with notice of the claimed tax illegality, the grounds advanced in support of the claimed illegality, and [to] afford[ ] the state the opportunity to fashion budget appropriations, or expenditures, taking into account the magnitude of the claimed tax illegality." Because the class was defined extensively enough to include all commercial license and permit holders, Judge Michalski held that the State should have known the magnitude of the potential claims and budgeted appropriately. It was therefore not necessary for each class member to protest the fee differential because to impose such a requirement would be a mere technicality. Judge Michalski thus held that the protest requirement of AS

---

**34.** *Id.*

**35.** *Id.*

**36.** *Id.*

**37.** The statute provides:

The Department of Administration shall, with the approval of the attorney general and the Department of Revenue, refund to a taxpayer the amount of a tax paid to the Department of Revenue under protest and deposited in the treasury if

(1) the taxpayer recovers judgment against the Department of Revenue for the return of the tax; or

(2) in the absence of a judgment, it is obvious to the Department of Revenue that the taxpayer would obtain judgment if legal proceedings were prosecuted by the taxpayer.

**38.** *Carlson II*, 919 P.2d at 1344.

**39.** 780 P.2d 1023, 1030–31 (Alaska 1989).

43.10.210(a) was satisfied by the certification of the class in the suit.

As to prejudgment interest, the State asserted that AS 45.45.010, which had been invoked in *Carlson II* as the basis for a determination of whether prejudgment interest was due,[40] only set the maximum interest rate and did not specifically authorize prejudgment interest. The superior court conceded that the State's interpretation of AS 45.45.010 was correct, but concluded that this court intended the superior court to look beyond just that statute in addressing the issue of prejudgment interest. Looking to AS 43.05.280, the superior court determined that interest was allowed on an overpayment of taxes. Because we held in *Carlson I* that Title 43 applied to the present case even though fees, and not taxes, were involved,[41] Judge Michalski held that the class could recover prejudgment interest on their overpaid commercial fishing fees were they ultimately to prevail on their claim.

Left undecided was the issue of what comprised the different components of the formula derived in *Carlson II*. This was resolved by the superior court at an evidentiary hearing held June 12–14, 2000. The court adopted the State's methodology for computing the fisheries budget with regard to both direct and indirect operating expenditures, but agreed with the class that general government costs, capital costs, the hatcheries loan fund subsidy, and forgone revenue from fishery resources could not be included when computing the fisheries budget. The resulting fisheries budget for fis-

cal year 1996 was $127,289,000. Both sides agreed on the methodology for determining Alaska's population, namely the yearly estimate made by the Alaska Department of Labor, yielding a state population of 605,212 in fiscal year 1996. The superior court agreed with the State that the oil revenues component should "include general fund petroleum revenues, the draw on the constitutional budget reserve, and the net income from the Alaska Permanent Fund appropriated each year." In fiscal year 1996 this resulted in a calculation that seventy-four percent of the state budget came from oil revenues. From these figures, a maximum fee differential of $155.64 was calculated for fiscal year 1996. The parties were then ordered to use the methodologies adopted by the superior court to calculate the allowable fee differential back to December 13, 1984 and any corresponding refund that may be necessary. This accounting has not yet been made. The State appealed and Carlson cross-appealed.

## III. STANDARD OF REVIEW

■■■■ The constitutionality of a statute and matters of constitutional or statutory interpretation are questions of law to which we apply our independent judgment.[42] We adopt the rule of law "that is most persuasive in light of precedent, reason, and policy."[43] Findings of fact are reviewed for clear error,[44] a standard that requires that great deference be given to the findings of the superior court.[45]

---

**40.** 919 P.2d at 1344.

**41.** 798 P.2d at 1280.

**42.** *Tesoro Petroleum Corp. v. State,* 42 P.3d 531, 535 (Alaska 2002); *Sampson v. State,* 31 P.3d 88, 91 (Alaska 2001).

**43.** *State v. Planned Parenthood of Alaska,* 35 P.3d 30, 34 (Alaska 2001) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**44.** *See Vezey v. Green,* 35 P.3d 14, 19–20 (Alaska 2001) (citations omitted) ("We review the trial court's findings of fact under the clearly erroneous standard. Under this standard, we will reject a factual finding only if we are 'left with the definite and firm conviction on the entire record that a mistake has been committed.' In addition,

we have stated that '[w]hen a trial court's decision of a factual issue depends largely on conflicting oral testimony, the trial court's competence to judge credibility of witnesses provides even a stronger basis for deference by the reviewing court.'"); *see also Rockstad v. Global Fin. & Inv. Co., Inc.,* 41 P.3d 583, 586 (Alaska 2002) ("[W]hen the trial court relies on extrinsic testimonial evidence to provide a factual basis for its interpretation of a contract, we apply the clearly erroneous standard in reviewing the court's background findings of fact.").

**45.** *See Matanuska Elec. Ass'n, Inc. v. Rewire the Bd.,* 36 P.3d 685, 700–01 (Alaska 2001) (noting that use of clearly erroneous standard of review for factual findings in contempt proceedings "is consistent with the deferential review used by courts in other jurisdictions").

## IV. DISCUSSION

### A. We Decline To Readdress the Constitutional Issues Already Raised and Resolved in *Carlson II.*

 The constitutionality of charging nonresidents more for commercial fishing licenses and permits has already been addressed, first in *Carlson I* [46] and then reaffirmed in *Carlson II.*[47] Whether we should readdress the issue here is a threshold question. In *Pratt & Whitney Canada, Inc. v. Sheehan*, we noted the importance of stare decisis but also recognized the need occasionally to deviate from existing precedent.[48] We stated that we "will overrule a prior decision only when 'clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent.' "[49] A prior ruling may be "originally erroneous" if it proves to be "unworkable in practice."[50] Changed conditions exist where "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, [or] facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application."[51] This law of the case doctrine[52] maintains that issues previously adjudicated can only be reconsidered where there exist "exceptional circumstances"[53] presenting a "clear error constituting a manifest injustice."[54] Once a case has been heard,[55] there are strong policy reasons for refusing to rehear it.[56]

The State accuses the class of rearguing the same case they brought in 1996, particularly with regard to the class's interpretation of *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, which the United States Supreme Court decided in 1994.[57] The State dismisses the only two post-*Carlson II* cases cited by the class—*Fulton Corp. v. Faulkner*[58] and *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*[59]—as inapplicable to the present case.[60] The class counters that there is no

46. 798 P.2d at 1274–78.

47. 919 P.2d at 1340–42.

48. 852 P.2d 1173, 1175 (Alaska 1993) ("When a common law court is asked to overrule one of its prior decisions, the principle of stare decisis is implicated.... [S]tare decisis is a practical, flexible command that balances our community's competing interests in the stability of legal norms and the need to adapt those norms to society's changing demands.").

49. *Id.* at 1176 (quoting *State v. Dunlop*, 721 P.2d 604, 610 (Alaska 1986)).

50. *Pratt & Whitney Canada*, 852 P.2d at 1176.

51. *Id.* (quoting *Planned Parenthood v. Casey*, 505 U.S. 833, 855, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).

52. *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 (Alaska 1977) ("The doctrine of the law of the case prohibits the reconsideration of issues which have been adjudicated in a previous appeal in the same case. Even issues not explicitly discussed in the first appellate opinion, but directly involved with or 'necessarily inhering' in the decision will be considered the law of the case. This doctrine is akin to the doctrine of res judicata, in that it requires that a final judgment be rendered with respect to the issues at hand.") (citations omitted).

53. *Patrick v. Sedwick*, 413 P.2d 169, 173–74 (Alaska 1966).

54. *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 583 (Alaska 1989).

55. *U.S. v. Hatter*, 532 U.S. 557, 566, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001) ("The law of the case doctrine presumes a hearing on the merits.").

56. *See Pratt & Whitney Canada*, 852 P.2d at 1175 ("[N]o judicial system could do society's work if it eyed each issue afresh in every case that raised it.") (quoting *Planned Parenthood*, 505 U.S. at 854, 112 S.Ct. 2791).

57. 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

58. 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996).

59. 520 U.S. 564, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997).

60. The State further argues that if there were anything questionable about the constitutionality of the fee differentials, the United States Supreme Court could have taken the case on certiorari but refused to do so. 519 U.S. 1101, 117 S.Ct. 789, 136 L.Ed.2d 730 (1997). However,

final judgment necessary to invoke the law of the case doctrine as delineated in *Wolff*.[61] The class further asserts that the law of the case doctrine is only a general principle and not an unyielding prohibition on revisiting prior decisions.[62] We agree with the State that our previous decisions on this issue preclude its reconsideration.[63]

The question before us is whether any legal precedent has arisen subsequent to *Carlson II* to indicate that that decision was somehow in error. A United States Supreme Court decision contradicting our holding in *Carlson II* would indicate a clear error and require us to revisit the issue of the constitutionality of the fee differentials. We interpret *Fulton* and *Camps Newfound* as clarifying the Supreme Court's position in *Oregon Waste Systems;* these two cases do not, however, alter the law in a way that would cause us to rethink our decision in *Carlson II.* We therefore do not believe that such a contradiction exists, nor do we find any other reason to revisit our holding in *Carlson II.*

### 1. *Fulton Corp. v. Faulkner* [64]

*Fulton Corp. v. Faulkner* addressed an intangibles tax by the state of North Carolina on corporate stock. The tax was assessed on the fair market value of corporate stock owned by North Carolina residents.[65] However, residents were allowed to take a tax deduction equal to the percentage of the corporation's income that was subject to tax in North Carolina.[66] This resulted in an inverse relationship between the tax that North Carolina residents were required to pay and the extent to which the company did its business in North Carolina, such that, for example, if the company did all of its business within the state, a resident owning its stock would not be required to pay any intangibles tax on that stock.[67] The Court rejected this tax as a violation of the Commerce Clause.[68] The Court explicitly recognized the applicability of the dormant Commerce Clause to the case,[69] but further acknowledged that a tax that facially discriminates against interstate commerce may be constitutional if the effect on interstate commerce is incidental [70] or if the tax is designed to make those engaged in interstate commerce bear

---

the United States Supreme Court can deny certiorari for a variety of reasons. Therefore, denial of certiorari should not be taken as a judgment on the merits of the case. *See Bridgers v. Texas,* 532 U.S. 1034, 121 S.Ct. 1995, 149 L.Ed.2d 779 (2001). It is easily conceivable that the Court refused certiorari because *Carlson II* was partially remanded and the Court wanted to wait to see what the final resolution of that case would be.

61. The class asserts that the law of the case doctrine is meant primarily as a restraint on trial courts. While this may be one of the functions, it is certainly not the exclusive purpose of the doctrine.

62. *See Smith v. Cleary,* 24 P.3d 1245, 1248 (Alaska 2001) ("The doctrine of the law of the case is a matter of judicial policy and describes 'the practice of courts generally to refuse to reopen what has been decided,' but does not limit their power to do so.") (quoting *West v. Buchanan,* 981 P.2d 1065, 1067 (Alaska 1999)) (citations omitted).

63. *See Smith,* 24 P.3d at 1248 ("[T]he policy against reconsidering issues adjudicated in a prior or appeal or issues 'directly involved with or necessarily inhering' in a prior decision applies only if there has been 'a final judgment ... with respect to the issues at hand.'") (citations omitted); *Brandon v. State,* 839 P.2d 400, 403–04

(Alaska App.1992) ("The doctrine of the law of the case prohibits the reconsideration of issues that this court has adjudicated in a previous appeal in the same case.").

64. 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996).

65. *Id.* at 327, 116 S.Ct. 848.

66. *Id.* at 328, 116 S.Ct. 848.

67. *Id.*

68. *Id.* at 346, 116 S.Ct. 848.

69. *Id.* at 330, 116 S.Ct. 848 ("In its negative aspect, the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.") (internal quotations omitted).

70. *Id.* at 331, 116 S.Ct. 848 ("In evaluating state regulatory measures under the dormant Commerce Clause, we have held that the first step ... is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce.") (quoting *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 99, 114 S.Ct.

the same economic burden as those engaged in intrastate commerce.[71] The Court then outlined a three-part test for determining if a compensatory tax was constitutional: (1) the State must identify the intrastate tax burden being compensated; (2) the tax must be shown to approximate but not exceed the burden on intrastate commerce; and (3) the events which are being taxed must be shown to be substantially equivalent between interstate and intrastate commerce.[72]

Although *Fulton* will be relevant in our analysis of what expenses can be included in the "fisheries budget," it has no bearing on the basic allowability of fee differentials for nonresidents because commercial fishing licenses are not objects of interstate commerce. We held in *Carlson II* that "[u]nlike the fee differentials in *Oregon Waste Systems* and *Chemical Waste*,[73] the fee differentials at issue in this case are not predicated

upon the movement of articles of commerce across state lines, but rather upon the residency status of those applying for permits." [74] Consequently, we held that the negative or dormant Commerce Clause did not apply to the present case, but rather that the fee differentials were properly analyzed under the Privileges and Immunities Clause.[75] Nothing in *Fulton* causes us to abandon this position. The tax in *Fulton* was tied directly to whether the corporation in question engaged in interstate or intrastate commerce.[76] It was therefore clearly "predicated upon the movement of articles of commerce across state lines." [77] No similar situation exists here, with the fee differential for nonresident commercial fishers relating not to commerce but rather to the opportunity to utilize Alaska's natural resources. Consequently, *Fulton* does not provide a reason to revisit an issue decided in *Carlson II*.[78]

---

1345, 128 L.Ed.2d 13 (1994) (internal quotations and citation omitted)).

71. *Fulton*, 516 U.S. at 331, 116 S.Ct. 848 ("[A] facially discriminatory tax may still survive Commerce Clause scrutiny if it is a truly compensatory tax designed simply to make interstate commerce bear a burden already borne by intrastate commerce.") (internal quotations and citation omitted).

72. *Id.* at 333, 116 S.Ct. 848. The Court, however, found that none of these conditions was satisfied by North Carolina's intangibles tax. *Id.* at 333–44, 116 S.Ct. 848. North Carolina attempted to argue that the intangibles tax "compensates for the burden of the general corporate income tax paid by corporations doing business in North Carolina." *Id.* at 334, 116 S.Ct. 848. North Carolina further argued that one of the services supported through a general corporate income tax "is the maintenance of a capital market for corporations wishing to sell stock to North Carolina residents." *Id.* at 335, 116 S.Ct. 848. The Court found this argument to be "unconvincing." *Id.* Drawing on *Oregon Waste Systems*, the Court found the use of a tax on interstate commerce to compensate for general revenues to be an "expansive loophole." *Id.* (quoting *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 105 n. 8, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). The Court proceeded to reject the specific application of the intangibles tax because of doubts that North Carolina used the tax proceeds to maintain an intrastate capital market, and the state's failure to detail the proportion of the corporate income tax used to support the capital market, as well as a lack of equivalence between out-of-state corporations and resident shareholders. *Fulton*, 516 U.S. at 336–40, 116 S.Ct. 848.

73. *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992).

74. 919 P.2d at 1340.

75. *Id.* at 1340–41. The Privileges and Immunities Clause does allow for nonresidents to be taxed on their business enterprises within a state. *See Shaffer v. Carter*, 252 U.S. 37, 52–53, 40 S.Ct. 221, 64 L.Ed. 445 (1920) ("That a state, consistently with the federal Constitution, may not prohibit the citizens of other states from carrying on legitimate business within its borders like its own citizens, of course is granted; but it does not follow that the business of nonresidents may not be required to make a ratable contribution in taxes for the support of the government. On the contrary, the very fact that a citizen of one state has the right to hold property or carry on an occupation or business in another is a very reasonable ground for subjecting such nonresident, although not personally, yet to the extent of his property held, or his occupation or business carried on therein, to a duty to pay taxes not more onerous in effect than those imposed under like circumstances upon citizens of the latter state.").

76. *Fulton*, 516 U.S. at 327–28, 116 S.Ct. 848.

77. *Carlson II*, 919 P.2d at 1340.

78. Even if we were to reach this issue, the fee differential would fall under the exception listed in *Fulton* whereby states can impose a facially discriminatory tax as long as it "make[s] interstate commerce bear a burden already borne by intrastate commerce." 516 U.S. at 331, 116 S.Ct. 848. We reached this conclusion in *Carlson I*, where we stated that "the state may equalize the economic burden of fisheries manage-

### 2. *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine* [79]

In *Camps Newfound,* the United States Supreme Court struck down a local Maine property tax exemption for a charitable camp that primarily served state residents.[80] A Maine town had attempted to argue that the business of the camp did not involve articles of commerce because the services of the camp were "delivered and 'consumed' entirely within Maine." [81] The Court noted that "[t]he attendance of these campers necessarily generates the transportation of persons across state lines that has long been recognized as a form of 'commerce.' " [82] We find there to be no direct analogy between the campers in *Camps Newfound* and the movement of commercial fishers into Alaska. The Court in *Camps Newfound* drew a comparison of the summer camps to hotels.[83] This comparison indicates a sufficient distinction from commercial fishing licenses and permits to allay concerns about the constitutionality of the fee differential.

The Court in *Camps Newfound* further compared the summer camps to a natural resource.[84] The Court pointed out that there is a long history of allowing residents and nonresidents alike equal access to natural resources in a state.[85] Quoting from *New England Power Co. v. New Hampshire,*[86] a

case in which the Court struck down a New Hampshire law attempting to place restrictions on a public utility's sales of hydroelectric energy generated in the state to out-of-state consumers, the Court stated that "[w]e have 'consistently ... held that the Commerce Clause ... precludes a state from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom.' " [87] The Court considered the two situations analogous because in both cases "the burden fell on out-of-state access both to a natural resource, and to related services provided by state residents." [88] The Court explained that "[b]y encouraging economic isolationism, prohibitions on out-of-state access to in-state resources serve the very evil that the dormant Commerce Clause was designed to prevent." [89]

The law in the present case, however, does not hinder or deny access to Alaska's natural resources, which in this case are the fisheries. Rather, the law merely allows the State to recoup from nonresidents the amount spent on maintaining the natural resource of the fisheries that it would be able to recover from nonresidents were they instead residents of Alaska. Nonresidents are being provided with equal access to the resource on

---

ment; where residents pay proportionately more by way of foregone benefits than nonresidents for fisheries management, nonresidents may be charged higher fees to make up the difference." 798 P.2d at 1278. We affirmed this decision in *Carlson II.* 919 P.2d at 1341–42. Furthermore, the fee differential satisfies the three-part test laid out in *Fulton:* (1) the fee differential is compensating for a clearly defined intrastate burden; (2) the fee differential is limited such that it does not exceed the burden borne by state residents; and (3) the event being taxed, namely the license to use state fisheries, is the same for residents and nonresidents. *See Fulton,* 516 U.S. at 333, 116 S.Ct. 848; *Carlson II,* 919 P.2d at 1342–44. Therefore, even if the fee differential were held to bear on interstate commerce, it would fall under one of the exceptions to the negative Commerce Clause.

79. 520 U.S. 564, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997).

80. *Id.* at 568–95, 117 S.Ct. 1590.

81. *Id.* at 572, 117 S.Ct. 1590.

82. *Id.* at 573, 117 S.Ct. 1590.

83. *Id.* at 573, 117 S.Ct. 1590.

84. *Id.* at 576–77, 117 S.Ct. 1590; *see also Hughes v. Oklahoma,* 441 U.S. 322, 337–38, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (striking down as violation of Commerce Clause Oklahoma law that placed no limits on number of minnows that could be caught and used within state but prohibited transportation of minnows out of state for sale because regulation of natural resources does not allow state to circumvent Commerce Clause).

85. *Camps Newfound,* 520 U.S. at 576, 117 S.Ct. 1590.

86. 455 U.S. 331, 338, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982).

87. *Camps Newfound,* 520 U.S. at 576, 117 S.Ct. 1590.

88. *Id.* at 577, 117 S.Ct. 1590.

89. *Id.* at 578, 117 S.Ct. 1590.

the condition that they make a contribution to the maintenance of the resource equal to that made by state residents.[90] The situation in the present case can therefore be distinguished from that in *Camps Newfound.* Thus, there is no reason to revisit our decision in *Carlson II.*

## B. The Formula for Calculating the Allowable Fee Differential for Nonresident Commercial Fishing Fees

In *Carlson II,* we held the per capita formula advanced by the class to be, in comparison to the pro rata formula proposed by the State, "the correct method for calculating the contribution made by residents."[91] The formula calculates the per capita resident contribution to the cost of fisheries management, regardless of whether this person is a fisher, as follows: (Fisheries Budget/Alaska Population) X (percentage of State Budget from oil revenues/1.0).[92] The figure determined by this formula for any given year is then compared to the actual fee differential charged. If the fee differential paid by the nonresident commercial fishers, i.e., the nonresident fee minus the resident fee for the same access, exceeds the resident contribution as calculated by the formula, then "the State will have failed to demonstrate that the means employed by its statute have a substantial enough relationship to the legitimate interest of the statute to survive Privileges and Immunities Clause review."[93]

It should be noted that the formula advanced by the class and adopted in *Carlson II* is not the only conceivable means for calculating an allowable fee differential for nonresidents. The United States Supreme Court requires only a "reasonable relation between the higher fees and the higher cost."[94] In *Carlson II,* we found the per

**90.** *Oregon Waste Systems v. Department of Environmental Quality* specifically distinguishes the situation in that case, where a higher fee was charged for the disposal of out-of-state waste than for in-state waste even though the cost of disposal of waste was the same no matter where the waste was generated, from a situation such as the present one where, absent a higher nonresident fee, the use of the fisheries and the cost of maintaining them imposes a higher cost on residents than on nonresidents. 511 U.S. 93, 101, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). Because the present case is properly analyzed as a Privileges and Immunities case, the primary concern is "to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). While nonresidents cannot be disadvantaged by their movement across state lines, there is nothing requiring that they benefit by such movement either. Nonresidents can therefore be required to compensate the state for the state resources they use. *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 281, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977) ("[T]he Court consistently has indicated that 'interstate commerce may be made to pay its way,' and has moved toward a standard of permissibility of state taxation based upon its actual effect rather than its legal terminology."). The holding in *Carlson II* accomplishes this by limiting the fee differential to the per capita resident contribution. *Carlson II,* 919 P.2d at 1343.

**91.** 919 P.2d at 1342.

**92.** *Id.* at 1343.

**93.** *Id.* at 1344.

**94.** *Mullaney v. Anderson,* 342 U.S. 415, 418, 72 S.Ct. 428, 96 L.Ed. 458 (1952). It is worth noting in passing that a multitude of other states allow nonresident commercial fishers to be charged higher fees than resident commercial fishers without any apparent reliance upon a formula to calculate the allowable fee differential. Delaware charges $150 for a resident commercial food fishing license and $1,500 for a comparable nonresident license. DEL.CODE ANN. tit. 7, § 914 (2001). Florida requires residents to pay $50 for a saltwater products license for an individual and $100 for a boat. Nonresidents are required to pay twice these amounts. FLA. STAT. 370.06(2)(a) (West 2001). Georgia charges $12 for a resident commercial fishing or crabbing license and $118 for a nonresident fishing or crabbing license. GA.CODE § 27–2–23 (2001). Maine establishes a fee of $89 for a commercial fishing license for a resident operator and all crewmembers and $334 for a commercial fishing license for a nonresident operator and all crewmembers. ME.REV.STAT ANN. tit. 12, § 6501 (West 2001). Michigan charges nonresidents five times the amount charged a resident for the same license. MICH. COMP. LAWS ANN. § 324.47330 (West 2001). For commercial eel fishing licenses New Jersey charges nonresidents the greater of the New Jersey fee or the amount that the nonresident would pay in their state of residence. N.J. STAT. ANN. § 23:3–72 (West 2001). In Oregon, a resident commercial fishing license costs $50 and a nonresident commercial fishing license costs $100. OR.REV.STAT. § 508.285(d), (e) (2001). South Carolina charges nonresidents five times the amount it charges residents for a variety of commercial equipment licenses. S.C.CODE ANN. § 50–5–325 (Law Co-op 2001). Texas charges nonresidents $100 for a general commercial fish-

capita formula advanced by the class to be an acceptable method for calculating the resident contribution to fisheries management and hence the allowable nonresident fee differential.[95] We continue to uphold the applicability of this formula.

We should clarify, however, that a refund will only be necessary if the difference between the actual fees charged to resident and nonresident commercial fishers is substantially in excess of the allowable fee differential indicated by the formula, such that the actual fees do not bear a reasonable relationship to costs not otherwise paid by nonresidents.[96] We leave to the superior court on remand to determine whether proportionality exists in any particular instance and whether a refund is due. These determinations are subject to review using an abuse of discretion standard.[97]

### 1. Components of the fisheries budget

The findings of fact and conclusions of law by the superior court describe the fisheries budget as being comprised of the State's "direct operating expenditures" and the State's "indirect operating expenditures."

The State in its pre-trial brief contended that the fisheries budget consists of six components: "(1) direct operating expenditures; (2) indirect operating expenditures; (3) general government expenditures; (4) capital costs; (5) hatchery loan fund subsidy; and (6) foregone revenues from fishery resources." Judge Michalski only accepted the first two of these items.

The concept of a fisheries budget goes well beyond what any particular agency requests from the State. It is necessary, then, to determine what the State spends from its general funds on its commercial fisheries. The record must support the belief that a rational relationship exists between the fee differential and the average cost of fisheries management to the resident.[98]

In determining the fisheries budget, Judge Michalski found that the figures the State provided for direct operating expenditures were justifiable and should be included in the final calculations. This figure totaled $126,099,100 for fiscal year 1996. Judge Michalski also held that indirect operating expenditures could be included in the fisheries budget as "based upon the federal formula for identifying indirect operating expenses[.]"

erman's license as compared to $15 for residents and $125 as compared to $65 for a commercial finfish fisherman's license. Tex. Parks and Wild. Code Ann. § 47.002–03 (Vernon 2001).

95. 919 P.2d at 1342–43.

96. *See Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287, 297, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998) ("[A]s a practical matter, the Privileges and Immunities Clause affords no assurance of precise equality in taxation between residents and nonresidents of a particular State. Some differences may be inherent in any taxing scheme, given that, '[l]ike many other constitutional provisions, the privileges and immunities clause is not an absolute,' and that '[a]bsolute equality is impracticable in taxation.' Because state legislatures must draw some distinctions in light of 'local needs,' they have considerable discretion in formulating tax policy. Thus, 'where the question is whether a state taxing law contravenes rights secured by [the federal Constitution], the decision must depend not upon any mere question of form, construction, or definition, but upon the practical operation and effect of the tax imposed.'" (citations omitted)); *Maxwell v. Bugbee*, 250 U.S. 525, 543, 40 S.Ct. 2, 63 L.Ed. 1124 (1919) ("[I]nequalities that result not from hostile discrimination, but occasionally and

incidentally in the application of a system that is not arbitrary in its classification, are not sufficient to defeat the law."); *see also Shaffer v. Carter*, 252 U.S. 37, 55, 40 S.Ct. 221, 64 L.Ed. 445 (1920) ("[W]here the question is whether a state taxing law contravenes rights secured by that instrument, the decision must depend not upon any mere question of form, construction, or definition, but upon the practical operation and effect of the tax imposed."); *Travelers' Ins. Co. v. Connecticut*, 185 U.S. 364, 371, 22 S.Ct. 673, 46 L.Ed. 949 (1902) ("It is enough that the state has secured a reasonably[ ] fair distribution of burdens, and that no intentional discrimination has been made against nonresidents.").

97. *See Breck v. Moore*, 910 P.2d 599, 606 (Alaska 1996) ("This court reviews an award of damages for an abuse of discretion and independently reviews the law applied by the trial court.").

98. *See Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264, 267 (4th Cir.1993) ("[T]he record does not disclose that the Commonwealth of Virginia has shown that it created any credible method of allocating costs as between residents and nonresidents which places the burden equally or approximately equally upon residents and nonresidents.").

The class does not challenge these indirect costs, which totaled $1,189,900 in fiscal year 1996.[99] Judge Michalski rejected the State's proposed inclusion of general government expenditures, capital costs, the hatchery loan fund, and forgone revenue from fisheries resources in the fisheries budget. The State challenges each of these exclusions.

The class challenged the list of fisheries expenditures provided by the State for direct operating expenditures as overly broad. The State sought to include in direct operating expenditures all those expenditures which go directly to support the commercial fishing industry as a whole. The *Carlson* cases hold that nonresidents can be made to pay for their share of the costs of fisheries management.[100] There is no precedent for determining if direct costs, indirect costs, general government expenditures, capital costs, the hatchery loan fund, and forgone revenue from fisheries resources in the fisheries budget are properly to be included in the expenses for fisheries management. Because this issue turns upon the legality of including different types of expenses in the budget for fisheries management, we decide the issue as a question of law.[101] Once the parameters of these budget components are established, the issue of calculating the exact amount of each component is a question of fact which is reviewed for clear error.

### a. Judge Michalski was not clearly erroneous in adopting the State's budget figures for direct and indirect costs.

■ Judge Michalski held that both direct and indirect operating expenditures should be included in the fisheries budget. We agree with this conclusion. In *Carlson I*, we stated that the State may "equalize the economic burden of fisheries management" by recovering from nonresidents the forgone revenues that residents pay for this expense.[102] The direct operating expenditures of fisheries management are implicitly included in this holding. The indirect operating expenditures are also contemplated by this holding because without the direct operating expenditures the indirect operating expenditures would not have been generated.[103]

The class does not challenge the general validity of either direct or indirect operating expenditures. Rather, it challenges the State's methodology for determining these figures by arguing that some of the amounts claimed by the State as direct operating expenses are not in fact directly associated with the costs of fisheries management.[104] How-

99. The class at trial did raise some objections to the way in which the State calculated indirect expenditures, mostly having to do with a blurring of the line between direct and indirect expenditures. On its cross-appeal, the class seems satisfied with the stipulated indirect expenditures in the findings of fact. However, if the amount of direct fisheries expenditures is adjusted, the indirect expenditures will have to be adjusted accordingly.

100. *Carlson I*, 798 P.2d at 1278; *Carlson II*, 919 P.2d at 1342–43.

101. *See Moody v. Delta Western, Inc.*, 38 P.3d 1139, 1140 (Alaska 2002) (holding that in question of law that is coming to court as case of first impression, de novo standard of review is applied).

102. *Carlson I*, 798 P.2d at 1278.

103. *See State v. Northwestern Constr., Inc.*, 741 P.2d 235, 240 (Alaska 1987) (allowing inclusion of overhead costs in breach of contract suit against state).

104. As the class notes, the State in *Carlson I* identified four sources as the "aggregate cost of fisheries management"—the annual operating budget of the Commercial Fisheries Entry Commission, 40.6% of the annual operating budget of the Department of Public Safety, the annual operating budget of the Division of Commercial Fisheries of the Department of Fish and Game, and the annual operating budget of the Fisheries Rehabilitation Enhancement and Development Division of the Department of Fish and Game. 798 P.2d at 1272. In *Carlson II*, the State similarly provided a chart in defense of its proposed pro rata formula listing "Expenditures By Four Agencies For Commercial Fishery Management." 919 P.2d at 1346. This chart goes from 1982 to 1989 and ranges from $29.0 million to $34.8 million; the amount in 1989 was $29.9 million. *Id*. The State presently seeks to include in the direct operating costs expenses beyond those limited to the four agencies it previously advanced. However, in the previous iterations of this case, the State did not have the benefit of knowing the formula by which the allowable fee differential is to be calculated. Therefore, the State was justified in offering a different definition of the fisheries budget than the one under which it previously operated since this earlier definition had effectively been rendered moot. Judge Michalski was

ever, following arguments by the parties on the appropriateness of the inclusion of different sub-components within the direct operating expenditures, Judge Michalski found that "the State's methodologies for valuing [direct and indirect operating expenditures] are appropriate." The class presents no persuasive argument on cross-appeal that this determination by the superior court is clearly erroneous. Judge Michalski agreed with the testimony by the State's expert witness that the disputed costs were directly related to the costs of fisheries management.[105] The testimony was sufficient to show that Judge Michalski was not clearly erroneous in his findings. Therefore, we affirm the findings of the superior court with regard to the methodology for determining direct and indirect operating expenditures and the corresponding calculations.

### b. General governmental expenditures cannot be included in the fisheries budget.

■ The State argues that it should be able to include "general governmental expenditures," such as "corrections, health care, and education," in determining the fisheries budget because if these services were not provided "the commercial fishing industry would either be inefficient or could not exist." The State further argues that these figures are tied to population and economic growth in the sense that an increase in commercial fishing leads to an increase in population,

which results in a corresponding growth in state expenditures on basic services.[106]

*Toomer v. Witsell,* a United States Supreme Court case on which the prior *Carlson* decisions rely, stated hypothetically that a fee differential allowing the State to recover conservation expenditures from taxes which only residents pay would be permissible.[107] *Carlson I* and *Carlson II* discussed allowing a fee differential to "equalize the economic burden of fisheries management." [108] Neither conservation expenditures nor fisheries management is as expansive as the general governmental expenditures that the State contends should be included in the fisheries budget. Judge Michalski noted that "the laws that relate to a particular case or the laws of the state are not necessarily the same as the economic laws and the rules that apply to things." While in economic terms the State may bear much of the cost of government generated by the fishing industry, this does not translate into a legal justification for including these costs in the fisheries expenditures.

There is clear precedent against including the general costs of government in any fee differential for nonresidents as part of a compensatory tax scheme. Citing *Oregon Waste Systems, Fulton* noted "the danger of treating general revenue measures as relevant intrastate burdens for purposes of the compensatory tax doctrine." [109] And *Camps Newfound* described *Chemical Waste* as holding that "special fees assessed on nonresidents directly by the State when they at-

consequently not in error to hear arguments on this matter.

**105.** For example, the second largest single expense for the direct operating costs is that of the "shared fish taxes." The class argues that these funds should not be counted as revenues because they are provided to local municipalities to defray fisheries-related impacts. The State responds that the revenue from the taxes goes to the general fund and is only then appropriated to municipalities. Judge Michalski did not rule explicitly on this issue. We hold that there is no difference between the shared fish taxes and other components of the fisheries budget. Judge Michalski accepted in whole the State's determination of the direct operating expenditures, which included the shared fish taxes. While testimony was offered that the taxes are essentially just a bookkeeping maneuver, it was not

clearly erroneous for Judge Michalski to find them otherwise.

**106.** The State and the class disagree as to the admissibility of expert testimony on the issue of the inclusion or exclusion of general governmental expenditures in the total fisheries expenditures; this, however, is a question of law and thus does not turn on expert testimony. We therefore need not address their dispute.

**107.** 334 U.S. 385, 399, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

**108.** *Carlson I,* 798 P.2d at 1278; *see also Carlson II,* 919 P.2d at 1342.

**109.** *Fulton Corp. v. Faulkner,* 516 U.S. 325, 335, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996).

tempt to use local services impose an impermissible burden on interstate commerce."[110] The Supreme Court, rejecting the State's claim that its surcharge on out-of-state garbage was compensatory in nature, stated in *Oregon Waste Systems* that

> permitting discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation "would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds." We decline respondents' invitation to open such an expansive loophole in our carefully confined compensatory tax jurisprudence."[111]

Nonresident commercial fishers may be expected to reimburse the State for a share of the costs of fisheries management. But to include general governmental costs in the manner in which the State suggests would expand the scope of the fisheries budget beyond the bounds of constitutionality.

### c. Capital costs directly supporting the commercial fishing industry can be included in the fisheries budget.

■ The State claims that both those capital expenditures that directly support the commercial fishing industry and general capital expenditures driven by population growth should be included in the fisheries budget. Judge Michalski rejected the inclusion of all capital costs in the fisheries budget, and the State has appealed.

The general capital expenditures are rejected for the reasons given in the previous section. As for the capital expenditures directly related to the commercial fishing industry, such as for boat harbors and salmon hatcheries, those costs should be included in the fisheries budget to the extent that they are not already included in the direct oper-

ating expenditures. These direct capital expenditures are a clearly identifiable result of the costs of fisheries management and as such justify the contribution of nonresidents to their payment thereof. Because the superior court rejected outright the inclusion of all capital costs, no differentiation was made between general capital costs and those directly supporting the commercial fishing industry. Such a determination will be necessary upon remand. If these costs are already included in the direct operating expenditures, the State will not be allowed to count them twice.

### d. The hatchery loan fund subsidy should be included in the fisheries expenditures.

■ The State operates a revolving loan fund to support investments in developing and operating fish hatcheries and other fish enhancement projects. The legislature created the Fishing Enhancement Revolving Loan Fund in 1977 to provide loans with favorable interest rates and repayment terms to private fishing corporations. By subtracting the present value of the future loan returns from the amount presently loaned, the State's expert was able to calculate what he considered a subsidy for the hatchery loan fund. However, testimony also was given that the funds collected in loan repayments do not go into the general fund but rather are used for new loans. Judge Michalski held that the supposed deficit incurred by the hatcheries loan fund was not a budgetary item "within the meaning of *Carlson II*" and thus could not be included in the fisheries expenditures for the purpose of determining nonresident contributions.

The State contends that the loan subsidy represents forgone revenues that the State could otherwise spend at present value. We agree. The hatcheries loan fund certainly benefits the commercial fishing industry. As such, it can be included in the costs of maintaining commercial fisheries. The State's ex-

**110.** *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine,* 520 U.S. 564, 578, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (citing *Chemical Waste Mgmt., Inc. v. Hunt,* 504 U.S. 334, 342, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992)).

**111.** *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 105 n. 8, 114 S.Ct. 1345, 128 L.Ed.2d 13 (quoting *Gov't Suppliers Consolidating Servs., Inc. v. Bayh,* 975 F.2d 1267, 1284 (7th Cir.1992)).

pert at trial calculated the cost to the State attributed to the hatcheries loan fund to be approximately $2.3 million for 1996. Because there appears to be some confusion as to whether the State is presently transferring any funds to the hatcheries loan fund and because the superior court did not make a ruling on what this amount would be, we remand on this issue for a determination of the yearly amount expended by the State to support this program. As with the capital costs, the expenditure for the hatcheries loan fund must not already have been included in the direct operating expenditures.

### e. Forgone revenues from commercial fishery resources cannot be included in the fisheries expenditures.

■ The State argues that because Alaska has the authority to manage its fish resources and could manage them in a way that is more profitable than the current method of fish management, it incurs an opportunity cost that should be included in the fisheries expenditures. The State cites a District of Columbia Circuit case in which the court remanded for consideration of whether a city could include "the value [the City] could have obtained in the best alternative use" in its calculation of the fair market value of the airfield land for the purpose of calculating user airplane landing fees.[112] That same court also held that opportunity costs can be used in setting utility rates.[113] Both of these property or energy rate value assessments, however, are fundamentally different from the State making a policy decision to allocate and utilize its resources in a particular way. The State has consciously chosen the manner in which it manages its fish, and has therefore decided to forgo any revenues that could be obtained from alternate forms of management. The State cannot recoup from nonresidents the possible revenue it forgoes in making policy decisions regarding its fisheries management. We therefore affirm the hold-ing of Judge Michalski to exclude forgone revenues from the cost of commercial fisheries management.

### 2. What can be included in oil revenues?

■ The class argues that the trial court erred by including interest income deposited into state savings accounts as a part of oil revenues. The class contends that because nonresidents do not benefit from deposits into the permanent fund and the constitutional budget reserve, those amounts should not be included in the calculation of oil revenues. However, because the class proposes including deposits into the permanent fund and the constitutional budget reserve in the figure for the total state budget, by which the oil revenues would be divided, its recommended calculation of the percentage of the state budget derived from oil revenues is clearly unworkable. One cannot exclude deposits into state savings accounts from the numerator of the formula determining the percentage of the state budget that is derived from oil revenues but include such deposits in the denominator, as this would inappropriately and dramatically reduce the percentage of the state budget derived from oil revenues.[114] Apples must be divided by apples, not oranges.

The class alternately proposes that investment earnings be removed from both the oil revenues and the total state budget expenditures by which the oil revenues are divided to determine the percentage of the budget funded by oil revenues. The class supports its position by noting that we have previously relied upon budget figures that included a variety of petroleum taxes, royalties, and rents, but not any interest income, in determining petroleum-related income.[115] Furthermore, the State, in its bi-yearly REVENUE SOURCE BOOK, uses this methodology in determining the percentage of unrestricted pe-

---

**112.** *City of Los Angeles Dep't of Airports v. United States Dep't of Transp.*, 103 F.3d 1027, 1034 (D.C.Cir.1997).

**113.** *See Pa. Elec. Co. v. F.E.R.C.*, 11 F.3d 207, 209–10 (D.C.Cir.1993).

**114.** The class approach yields a figure of 29.7%, far less than the 74% adopted by Judge Michalski.

**115.** *Trustees for Alaska v. State, Dep't of Natural Res.*, 795 P.2d 805, 810 (Alaska 1990).

troleum revenue as compared to unrestricted general funds.[116]

The State counters by arguing that because the source of the funds that generates the interest income is ultimately petroleum-derived, it should be included in the oil revenues component. It should not matter, the State contends, how these funds are spent, only how they are derived, even if the expenditure of the funds is of no benefit to nonresidents. The State proceeds to demonstrate how the 74% figure was calculated by including the petroleum-derived revenues deposited in state savings accounts in both the numerator and denominator of the percentage of the state budget derived from oil revenues.

Judge Michalski accepted the State's methodology for calculating the percentage of the state budget derived from oil revenues, resulting in a figure of 74%. This calculation includes the interest income and permanent fund expenditures in both the numerator and the denominator. As with the basic formula for maximum allowable fee differential, there is no single correct method by which to calculate the percentage of the state budget derived from oil revenues. The key inquiry is that the methodology adopted bear a reasonable relationship to the figure to be calculated. The decision of the superior court to adopt the State's method of calculation is therefore reviewed for an abuse of discretion.[117] Because the State's methodology provides a reasonable means for calculating the percentage of the state budget derived from oil revenues, we find there to be no abuse of discretion and accordingly affirm the superior court.

## C. The State Has Previously Conceded that the Class Met the Protest Requirement.

■■■ The class filed suit on June 22, 1984, questioning the "legality of the State of Alaska's discriminatory fees for nonresident commercial fishing permits and licenses." The class on behalf of which the suit was filed was defined as "all persons who participated in one or more Alaska commercial fisheries at any time who paid nonresident assessments to [the] State for commercial or gear licenses or permits." On December 10, 1984, the State entered its nonopposition to certification of the case as a class action, though it did reserve the right to request that the class be divided into subclasses. On December 13, 1984, Superior Court Judge Milton M. Souter entered an order certifying the class. A later motion to decertify the class was denied by Judge Michalski on July 17, 1998. Judge Michalski held that the elements of numerosity, commonality, typicality, and adequacy of representation existed to justify continued certification of the class.

Alaska Statute 43.10.210(a) requires that in order for a refund to be given on an illegal tax, the tax must have been paid under protest. We held in *Carlson I* that a license was a tax within the meaning of the refund statute and that therefore the protest requirement applied to the class.[118] In *Principal Mutual Life Insurance Co. v. State, Division of Insurance*, we held that "[t]he protest requirement called for by AS 43.15.010(a) [119] serves ... as proof that the payment of the tax in question was involuntarily made and it provides notice to the taxing authority that

116. This calculation yields the 86% figure previously relied upon by this court in *Trustees for Alaska*. 795 P.2d at 810.

117. *See Seattle Master Builders Ass'n v. Pacific Northwest Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1370 (9th Cir.1986) ("The choice of methodology is a highly technical question which falls within the unique expertise of the Council. Unless an abuse of discretion is demonstrated, this court will not substitute its judgment on particular testing methodology."); *United States Steel Group–A Unit of USX Corp. v. United States*, 873 F.Supp. 673, 700 (Ct. Int'l Trade 1994) (holding that choice of methodology by trade commission was subject to review by

abuse of discretion standard); *see also Dansereau v. Ulmer*, 955 P.2d 916, 919 (Alaska 1998) (holding that superior court did not abuse its discretion in adopting particular methodology to calculate number of hours litigants' attorneys worked for purpose of determining award of attorney's fees); *Gallant v. Gallant*, 882 P.2d 1252, 1257 (Alaska 1994) (reviewing for abuse of discretion allocation of child support in novel case involving nonparental custody).

118. 798 P.2d at 1280.

119. The statute has subsequently been renumbered as AS 43.10.210(a).

the tax is claimed to be illegal as well as the basis of the taxpayer's assertion." [120] A requirement of protest provides the state with notice of more than mere opposition to the tax—it provides the state with notice that it may soon be facing a lawsuit to recover the allegedly illegal amount. Once on notice, the state can budget accordingly to prepare for the possibility of losing at trial and being forced to refund the disputed amount. [121]

Judge Michalski held that the purpose of the notice requirement was met by the certification of the class action suit. The certification of a lawsuit over allegedly illegal taxes puts the state on notice that the taxes are being protested and that future tax recovery may be subject to being refunded. The State, however, argues that notice of named plaintiffs does not translate into notice of the entire class of plaintiffs and that at the very least the class should not be entitled to retrospective relief. [122] Judge Michalski held that the expansive definition of the class as containing all fee-paying commercial fishers gave the state sufficient notice of the potential scope of the recovery. Judge Michalski further held that the certification of a class action suit obviated the need for individual protest by each class member, reasoning that "[r]equiring individual protest for each class member would do nothing to further inform the state. Instead, it would be merely an exercise in formality and technicality."

The State has long since conceded that, as to fees paid after June 22, 1984, the protest requirement was met by the filing of the class action suit and that sufficient notice had been given "for purposes of AS 43.10.210(a)."

In its reply brief in the superior court, dated September 2, 1992, the State asserted:

> Plaintiffs are wrong when they assert that the State has conceded the right to a refund of any unconstitutional fees paid after the date plaintiffs filed their lawsuit. While this point is irrelevant to the issue immediately before the court, the State concedes only that the lawsuit serves as an adequate notice of protest for purposes of AS 43.10.210(a). In other words, all fees paid after June 22, 1984, by nonresident commercial fishers who ultimately elect to join the class, in excess of fees paid by similarly situated resident commercial fishers, are deemed to have been paid under protest. The protest requirement of AS 43.10.210(a), however, is merely one precondition to the "[r]ecovery of overpayments and protested payments." [citing an earlier memorandum] The State does not concede that plaintiffs have satisfied any other procedural or substantive requirements that may apply. [123]

This admission that the protest requirement had been met is consistent with the State's earlier admissions that it was provided with sufficient notice. In an opposition to plaintiff's motion for a preliminary injunction, dated February 19, 1991, the State asserted that

> [w]ith regard to any nonresident differentials which have been received by the state since this class action was filed, the state views the lawsuit itself as a protest giving the state the contemplated notice. Thus, for any differentials received between now and the conclusion of this case, should any portion of those be determined to be inval-

---

**120.** 780 P.2d 1023, 1030 (Alaska 1989).

**121.** *Id.* at 1030–31 ("The burden of requiring a taxpayer to file a protest at the time of payment of the tax is at most minimal. On the other hand the requirement of a protest serves the important function of providing state government with notice of the claimed tax illegality, the grounds advanced in support of the claimed illegality, and affords the state the opportunity to fashion budget appropriations, or expenditures, taking into account the magnitude of the claimed tax illegality. We think these are significant considerations which warrant the retention of the requirement of a protest.").

**122.** The State asserts that an early superior court argument created an estoppel argument against

retroactive fees. The protest issue of this superior court opinion, however, was remanded for further inquiry in *Carlson I*, albeit without specifically addressing the estoppel argument alluded to by the superior court. 798 P.2d at 1280.

**123.** This statement was given in a reply brief opposing waiver of the protest issue. The State made a similar statement on March 1, 1991 in a memorandum in support of a motion for summary judgment: "The state does not dispute here that the differential paid by nonresidents to engage in commercial fishing since the date that this class action was filed, June 22, 1984, have been paid under protest."

id, plaintiffs can avail themselves of the statutory refund remedy identified by the supreme court to obtain damages.

The State presently contends that prior to Judge Michalski's ruling in 1998 it had no reason to believe that it would be required to pay a refund and thus should not be required to pay a refund retrospectively all the way back to 1984. However, the purpose of the protest requirement, as stated above, is to give the state notice that it may eventually be required to pay a refund.[124] The fact that the litigation may take a long time to resolve and that the refund may thus grow increasingly large does not absolve the State of its eventual responsibility to pay. Thus, the only relevant question is whether the filing of a class action gives the State sufficient notice that every member of the class may be due a refund.[125] We agree with Judge Michalski that it does.

The State cites *Era Aviation* in support of its claim that a separate protest must be attached to each separate complaint.[126] *Era Aviation* involved a suit by several air carriers to protest increased landing fees at rural airports.[127] After the original set of plaintiffs were granted summary judgment, a different set of air carriers tried to join the suit and recover fees retroactively.[128] We held that the second set of air carriers did not satisfy the necessary protest requirement at the time of the payment of the fees, even though they had stated their opposition to the landing fees on numerous occasions and even though the suit by the original set of air carriers put the state on notice that the fees might be illegal.[129] As the State is careful to point out, however, in *Era Aviation* we expressly declined to answer the question whether a class action suit would satisfy the protest requirement.[130] *Era Aviation* is thus not dispositive of the present situation.

In a further attempt to prove that the protest requirement would not be satisfied by a class action, the State cites a series of cases where class status has been denied for failure to satisfy the proper administrative procedures for protest.[131] These cases, however, are not applicable to the present case, where the class has already been certified. The present class satisfied the necessary pro-

---

124. *See Principal Mutual Life Ins.,* 780 P.2d at 1030–31.

125. The class argues that federal due process prevents the denial of retroactive tax recovery under *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 39, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) ("To satisfy the requirements of the Due Process Clause, therefore, in this refund action the State must provide taxpayers with, not only a fair opportunity to challenge the accuracy and legal validity of their tax obligation, but also a 'clear and certain remedy,' for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one.") (citations omitted). In *McKesson,* the United States Supreme Court ordered that a refund be given for an illegal tax even though Florida claimed this would cause the state serious economic injury. 496 U.S. at 51 n. 35, 110 S.Ct. 2238 ("We reject respondents' intimation that the cost of any refund considered by the State might justify a decision to withhold it. Just as a State may not object to an otherwise available remedy providing for the return of real property unlawfully taken or criminal fines unlawfully imposed simply because it finds the property or moneys useful, so also Florida cannot object to a refund here just because it has other ideas about how to spend the funds."). The class errs, however, when it invokes *Harper v. Virginia Department of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (hold-

ing that federal remedy for unlawful tax applies not only to case at issue but also to parties in all other open cases). In the present case, the class either exists as a whole or it does not exist at all for the purposes of the protest requirement. There are thus no other open cases to which a due process concern could apply.

126. *Era Aviation, Inc. v. Campbell,* 915 P.2d 606, 609 (Alaska 1996) ("[U]nder common law as well as under statute, a protest at the time of payment is a prerequisite for an action to recover taxes.").

127. *Id.* at 607. The original plaintiffs did not form a class.

128. *Id.* at 607–08.

129. *Id.* at 612.

130. *Id.* at 612–13 (noting that state's ability to determine accurately its potential liability for fee refunds "would be undermined if a single lawsuit (which was not even a class action) were deemed sufficient notice to make all payers under the regulation eligible for refunds").

131. *Aronson v. City of Pittsburgh,* 98 Pa.Cmwlth. 1, 510 A.2d 871, 873 (1986); *Aronson v. Commonwealth,* 401 Mass. 244, 516 N.E.2d 137, 144 (1987).

cedural hurdles, and the State did not object to the certification of the class. Furthermore, the State, because it was the entity issuing the commercial fishing licenses and permits, had ample opportunity to keep records of those to whom these licenses and permits were being issued. It is therefore disingenuous for the State to claim that it was somehow caught unaware as to the ultimate size of the class or the potential recovery. For this reason, we affirm the holding of Judge Michalski that the protest and notice requirement was satisfied.

As to the date from which the fees can be measured, Judge Michalski selected December 13, 1984, which was the day the class was certified.[132] The class does not challenge the date of certification as the date from which fees can be measured. We therefore affirm December 13, 1984 as the date from which fees can be measured.

### 1. Named class members can sue for tax relief on behalf of unnamed class members.

Even if a class action suit constitutes notice, there is a separate question as to whether the named class members can sue on behalf of the unnamed class members without the unnamed class members themselves protesting the increased nonresident fees. Judge Michalski held that the class was to be treated as a unified legal entity and that therefore absent and non-protesting (i.e., unnamed) class members could not be excluded from the recovery of excess fees. This is consistent with both *Carlson I* and *Carlson II*, both of which speak of the class as a

whole and neither of which mentions the possibility that only the named class members will be able to receive a refund.[133]

The State asserts that named class members should not be allowed to sue for unnamed class members because there are too many variables that determine exactly what each nonresident commercial fisher is to recover. Because individual interests in recovery are so unique, the State argues, only the individual taxpayers should be allowed to sue for their own recovery. The State also cites two cases where class status was denied to a taxpayer attempting to sue on behalf of a similarly situated taxpayer who had not protested the tax.[134]

These arguments would be appropriate in a motion to decertify the class, but the State lost on its bid to decertify the class and does not challenge that holding on appeal. Instead, the State attempts to circumvent the class certification issue by arguing that named class members cannot sue on behalf of unnamed class members. Yet, this is precisely the purpose of forming a class in the first place. Indeed, in *Nolan v. Sea Airmotive, Inc.*, we stated that one of the reasons for revising Alaska Civil Rule 23, the rule for establishing class actions, into its current form was "to end the 'perverse anomaly' by which there could 'be such a thing as a class action that did not run fully for or against the class.'"[135] Class action suits, in which the result for one becomes the result for many in the same legal predicament, are necessary to avoid a multiplicity of duplicative lawsuits.[136] Requiring that each nonres-

---

**132.** The class action suit was filed on June 22, 1984. In *Carlson II*, we held that "the record indicates that the State agrees that those fees which were paid after June 22, 1984, were paid under protest sufficient to permit a refund under AS 43.10.210." 919 P.2d at 1344. As noted above, the State several times also stated that the protest requirement was met as of June 22, 1984. These prior statements, however, do not require us to reverse the decision of the superior court, which was not an abuse of discretion.

**133.** *See Carlson I*, 798 P.2d at 1279–80; *Carlson II*, 919 P.2d at 1343–45.

**134.** *Hooks v. Comptroller of Treasury*, 265 Md. 380, 289 A.2d 332, 333–34 (1972); *Edisto Fleets,*

*Inc. v. S.C. Tax Comm'n*, 256 S.C. 350, 182 S.E.2d 713, 714 (1971).

**135.** 627 P.2d 1035, 1044 (Alaska 1981) (quoting Benjamin Kaplan, *"The Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure,"* 81 Harv. L.Rev. 356, 386 (1967)). We therefore struck down a statutory requirement that an individual be named in a wage and hour suit in order for the statute of limitations to be tolled. 627 P.2d at 1046–47. The class correctly notes that AS 43.10.210 does not require prospective class members to opt into the class.

**136.** *Nolan*, 627 P.2d at 1044 ("These policies implicate the questions of when joinder of parties

ident commercial fisher file suit on his or her own behalf, which is what the State seems to be advocating, would produce exactly that result. Therefore, Judge Michalski's decision that named class members may sue on behalf of unnamed class members is affirmed.

### 2. The State's "sovereign immunity" defense cannot first be raised at this late date and was outside the scope of remand.

The State asserts that it "has not waived its sovereign immunity" from class actions for fee refunds. Although the State frames its argument in terms of sovereign immunity, it is not making a core sovereign immunity claim that the State is immune from suit on a particular claim or issue. Rather, the State appears to be arguing that based on its interpretation of the language of AS 43.10.210(a), plaintiffs are precluded from using one particular means of seeking a tax refund—a class action. Therefore, the State's argument addresses a question of statutory interpretation of the requirements of AS 43.10.210(a), an analysis which necessarily has some sovereign immunity overtones.

▬ We reject the State's argument that it has not waived its "sovereign immunity" claim for two reasons. First, the State failed to raise this argument when the issue of the class's right to a refund was being litigated in the trial court and before us in the first appeal. Prior to the appeal leading to *Carlson I*, the class filed a cross-motion for partial summary judgment seeking a declaration, in principle, that the class was entitled to a refund. The State opposed this cross-motion on several grounds, but not on the ground that AS 43.10.210(a) did not allow refund class actions. After the trial court declined to grant the class's motion, the class appealed the court's refusal to rule that the

class was entitled to a refund. Again, the State did not defend on the basis that the statute did not allow class actions for refund claims. We agreed with the class in *Carlson I* that in principle it would be entitled to a refund if there were unconstitutional discrimination, subject to the condition that the statutory protest requirement had to be either satisfied or waived.[137] Thus, in *Carlson I*, the class prevailed on its argument that it was entitled to a refund if unconstitutional discrimination were found. The State's failure to raise its immunity argument before the superior court and before this court at the time this issue was being litigated precludes the State from raising this defense now.[138]

▬ Second, the State's defense is outside the scope of *Carlson II's* remand. The State maintains that its argument was properly raised because it falls within *Carlson II's* remand order that the superior court "decide whether the filing of this suit constituted notice sufficient to comply with the protest requirement of AS 43.10.210(a)[.]"[139] The State's argument, however, does not address the adequacy of notice or protest. Rather, what the State argues is that the word "taxpayer" in AS 43.10.210(a) does not include a class and that therefore the statute does not permit a class to sue for a tax refund. "When an appellate court issues a specific mandate a trial court has no authority to deviate from it."[140] The State's defense could not have fallen within the scope of *Carlson II's* remand because the State did not argue it before the trial court prior to the final judgment that led to *Carlson II*, nor did the State appeal on this ground in *Carlson II*.

▬ Successive appeals should narrow

---

and claims should be allowed, and the proper procedure for handling cases in which numerous parties or claims are involved. Absent an ability to provide for these matters by appropriate rules of procedure, it is possible that vast amounts of judicial, administrative, and private resources would be wasted.").

137. *Carlson I*, 798 P.2d at 1279–80.

138. *Cf. Univ. of Alaska v. Simpson Bldg. Supply Co.*, 530 P.2d 1317, 1323–24 (Alaska 1975).

139. *Carlson II*, 919 P.2d at 1344.

140. *Gaudiane v. Lundgren*, 754 P.2d 742, 744 (Alaska 1988) (citing *King v. Alaska State Hous. Auth.*, 571 P.2d 1010, 1011–12 (Alaska 1977)).

the issues in a case, not expand them.[141] Other jurisdictions have explicitly ruled that all matters that were or might have been determined in a former appeal may not be presented in a subsequent appeal of the same case.[142] The basis for this rule is that "[j]udicial economy and the parties' interests in the finality of judgments are in no way furthered if parties are allowed to engage in piecemeal appeals."[143] We have expressed a similar rule in the context of res judicata, which involves subsequent suits rather than subsequent appeals.[144] Because it could have been raised in earlier appeals but was not, and because it therefore falls outside the scope of our specific remand in *Carlson II*, we decline to address the State's "sovereign immunity" defense that AS 43.10.210(a) does not permit class actions for fee refunds.

To the extent that the State is arguing that sovereign immunity bars class actions in which the class includes taxpayers who have not met the administrative prerequisite of providing notice via protest, we have already addressed the issues of protest, notice, and division of the class in this opinion. Because the State conceded notice and protest, there was no need for the trial court to address the "sovereign immunity" defense in considering these arguments. Moreover, we have already upheld in this opinion the superior court's treatment of the class as a unified legal entity. Accordingly, we need not address the State's argument in the context of absent class members' refund claims.

### D. The Class May Recover Prejudgment Interest on Any Refund that May Be Due.

In *Carlson II*, we directed the superior court to determine on remand whether prejudgment interest is due under AS 45.45.010.[145] As the superior court correctly noted, AS 45.45.010 "merely sets the maximum rate of interest that may be charged." Consequently, the superior court looked to related statutory provisions to address the prejudgment interest issue. The superior court concluded that because *Carlson I* applied Title 43 as it relates to the allowable statute of limitations,[146] Title 43 should also apply to the question of prejudgment interest. The superior court reasoned that because AS 43.05.280 allows for prejudgment interest for an overpayment of taxes, prejudgment interest should be allowed in the present case.

The State argues that while prejudgment interest is allowed for taxes derived under Title 43, it is not allowed for taxes derived under Title 16, which is the title authorizing the commercial fishing fees. Noting again the importance of construing waivers of sovereign immunity strictly, the State proceeds to discuss a wide range of cases holding that waivers of sovereign immunity imposing monetary liability on the federal or state

141. Cf. *Watts v. Seward Sch. Bd.*, 421 P.2d 586, 618 (Alaska 1966) (Rabinowitz, J., dissenting in part and concurring in part), *vacated*, 391 U.S. 592, 88 S.Ct. 1753, 20 L.Ed.2d 842 (1968) (explaining that law of the case doctrine, which prohibits reconsideration of issues that have been explicitly or inherently adjudicated in previous appeal, promotes judicial economy by "narrowing down the issues in successive stages of litigation"); *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex.1986) ("By narrowing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency.").

142. E.g., *MacKay v. Hardy*, 973 P.2d 941, 947 (Utah 1998); *Penrich, Inc. v. Sullivan*, 140 N.H. 583, 669 A.2d 1363, 1367 (1995); *Hartford Nat'l Bank & Trust Co. v. Tucker*, 195 Conn. 218, 487 A.2d 528, 530 (1985); *First Am. Nat'l Bank v. Booth*, 270 Ark. 702, 606 S.W.2d 70, 71 (1980);

*Kazubowski v. Kazubowski*, 45 Ill.2d 405, 259 N.E.2d 282, 288 (1970); *E.F. Prichard Co. v. Heidelberg Brewing Co.*, 314 Ky. 100, 234 S.W.2d 486, 487–88 (1950); *Montgomery v. Trisler*, 771 N.E.2d 1234, 1239 (Ind.App.2002); *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 46 P.3d 431, 436 (Ariz.App.2002); *Baker v. Nat'l State Bank*, 353 N.J.Super. 145, 801 A.2d 1158, 1167 (2002).

143. *MacKay*, 973 P.2d at 947. *See also First Am. Nat'l Bank*, 606 S.W.2d at 71; *Kazubowski*, 259 N.E.2d at 288; *Bike Fashion Corp.*, 46 P.3d at 436.

144. *Robertson v. Am. Mech., Inc.*, 54 P.3d 777, 780 (Alaska 2002); *Sengupta v. University of Alaska*, 21 P.3d 1240, 1254 (Alaska 2001).

145. 919 P.2d at 1344.

146. *See* 798 P.2d at 1280.

government must be narrowly interpreted.[147] We have expressed similar sentiments, holding that "only the legislature has the power to direct the assessment of interest against the sovereign"[148] and that "except where the constitution directs otherwise, interest may not be assessed against the State except where interest is specifically authorized by the legislature."[149] However, we have also held that "it would be unduly technical to deny [a claimant bringing suit against the state] interest based on a mere matter of form."[150] Furthermore, the Ninth Circuit allowed prejudgment interest under the territorial predecessor to AS 43.10.210(a).[151]

The introductory language of AS 43.05.275, applied to the present case in *Carlson I*,[152] is fundamentally the same as the introductory language at issue here in AS 43.05.280 in that both apply to a tax under this title. It is hard to imagine applying section .275 and not section .280 to the present case even if one interprets the latter more strictly than the former. Alaska Statute 43.05.280 applies to all overpayment of taxes under Title 43.[153] This statutory section should therefore apply to the provisions for recovery of overpayments laid out in AS 43.10.210. Because AS 43.05.280 serves as the primary justification for providing the class with a refund, the prejudgment interest available under AS 43.10.210 in other actions extends to the recovery of prejudgment interest for overpayment of commercial fishing fees, even though these are ostensibly created under Title 16.[154]

## V. CONCLUSION

We have previously addressed the constitutionality of charging nonresidents more than residents for commercial fishing licenses and entry permits. The class has failed to present any valid arguments as to why we should reconsider this position. We therefore AFFIRM the formula adopted in *Carlson II* for calculating the maximum allowable fee differential for nonresidents. We further AFFIRM the holding of the superior court adopting the State's methodology for calculating direct and indirect costs associated with fisheries management. We AFFIRM the exclusion of general government expenditures and forgone revenues from fishing, but we REVERSE and REMAND on the issue of the hatcheries loan fund subsidy, and we partially REMAND on the issue of capital costs. We conclude that the State has waived its objection to the protest and notice requirement of AS 43.10.210(a), as well as a related sovereign immunity claim. We AFFIRM the decision of Judge Michalski that the refund applies to unnamed class members. Finally, we hold that the class may recover prejudgment interest if it obtains a refund on remand.

147. *See, e.g., Library of Cong. v. Shaw*, 478 U.S. 310, 311, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) ("The no-interest rule is to the effect that interest cannot be recovered in a suit against the Government in the absence of an express waiver of sovereign immunity from an award of interest."), *superseded by statute on other grounds as stated in Landgraf v. USI Film Products*, 511 U.S. 244, 251, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

148. *Stewart & Grindle, Inc. v. State*, 524 P.2d 1242, 1245 (Alaska 1974).

149. *Danco Exploration, Inc. v. State, Dep't of Natural Res.*, 924 P.2d 432, 434 (Alaska 1996).

150. *Id.*

151. *Mullaney v. Hess*, 189 F.2d 417, 420 (9th Cir.1951).

152. 798 P.2d at 1280.

153. AS 43.05.280(a) provides: "Interest shall be allowed and paid on an overpayment of a tax under this title at the rate and in the manner provided in AS 43.05.225(1)."

154. We are not here ruling on whether the class will be due a refund upon remand. Rather, we are only stating that if upon remand it is determined that a refund is due, prejudgment interest can be obtained on that refund.